*318 Justice Kennedy
delivered the opinion of the Court.
Federal law prohibits corporations and unions from using their general treasury funds to make independent expendi *319 tures for speech defined as an “electioneering communication” or for speech expressly advocating the election or defeat of a candidate. 2 U. S. C. § 441b. Limits on electioneering communications were upheld in McConnell v. Federal Election Comm’n, 540 U. S. 93, 203-209 (2003). The holding of McConnell rested to a large extent on an earlier case, Austin v. Michigan Chamber of Commerce, 494 U. S. 652 (1990). Austin had held that political speech may be banned based on the speaker’s corporate identity.
In this case we are asked to reconsider Austin and, in effect, McConnell. It has been noted that “Austin was a significant departure from ancient First Amendment principles,” Federal Election Comm’n v. Wisconsin Right to Life, Inc., 551 U. S. 449, 490 (2007) (WRTL) (Scalia, J., concurring in part and concurring in judgment). We agree with that conclusion and hold that stare decisis does not compel the continued acceptance of Austin. The Government may regulate corporate political speech through disclaimer and disclosure requirements, but it may not suppress that speech altogether. We turn to the case now before us.
I
A
Citizens United is a nonprofit corporation. It brought this action in the United States District Court for the District of Columbia. A three-judge court later convened to hear the cause. The resulting judgment gives rise to this appeal.
Citizens United has an annual budget of about $12 million. Most of its funds are from donations by individuals; but, in addition, it accepts a small portion of its funds from for-profit corporations.
In January 2008, Citizens United released a film entitled Hillary: The Movie. We refer to the film as Hillary. It is a 90-minute documentary about then-Senator Hillary Clinton, who was a candidate in the Democratic Party’s 2008 Presidential primary elections. Hillary mentions Senator *320 Clinton by name and depicts interviews with political commentators and other persons, most of them quite critical of Senator Clinton. Hillary was released in theaters and on DVD, but Citizens United wanted to increase distribution by making it available through video-on-demand.
Video-on-demand allows digital cable subscribers to select programming from various menus, including movies, television shows, sports, news, and music. The viewer can watch the program at any time and can elect to rewind or pause the program. In December 2007, a cable company offered, for a payment of $1.2 million, to make Hillary available on a video-on-demand channel called “Elections ’08.” App. 255a-257a. Some video-on-demand services require viewers to pay a small fee to view a selected program, but here the proposal was to make Hillary available to viewers free of charge.
To implement the proposal, Citizens United was prepared to pay for the video-on-demand; and to promote the film, it produced two 10-second ads and one 30-second ad for Hillary. Each ad includes a short (and, in our view, pejorative) statement about Senator Clinton, followed by the name of the movie and the movie’s Web site address. Id., at 26a-27a. Citizens United desired to promote the video-on-demand offering by running advertisements on broadcast and cable television.
B
Before the Bipartisan Campaign Reform Act of 2002 (BCRA), federal law prohibited — and still does prohibit— corporations and unions from using general treasury funds to make direct contributions to candidates or independent expenditures that expressly advocate the election or defeat of a candidate, through any form of media, in connection with certain qualified federal elections. 2 U. S. C. § 441b (2000 ed.); see McConnell, supra, at 204, and n. 87; Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 249 (1986) (MCFL). BCRA §203 amended *321 §441b to prohibit any “electioneering communication” as well. 2 U. S. C. §441b(b)(2) (2006 ed.). An electioneering communication is defined as “any broadcast, cable, or satellite communication” that “refers to a clearly identified candidate for Federal office” and is made within 30 days of a primary or 60 days of a general election. § 434(f)(3)(A). The Federal Election Commission’s (FEC) regulations further define an electioneering communication as a communication that is “publicly distributed.” 11 CFR § 100.29(a)(2) (2009). “In the case of a candidate for nomination for President... publicly distributed means” that the communication “[c]an be received by 50,000 or more persons in a State where a primary election ... is being held within 30 days.” § 100.29(b)(3)(ii)(A). Corporations and unions are barred from using their general treasury funds for express advocacy or electioneering communications. They may establish, however, a “separate segregated fund” (known as a political action committee, or PAC) for these purposes. 2 U. S. C. § 441b(b)(2). The moneys received by the segregated fund are limited to donations from stockholders and employees of the corporation or, in the case of unions, members of the union. Ibid.
C
Citizens United wanted to make Hillary available through video-on-demand within 30 days of the 2008 primary elections. It feared, however, that both the film and the ads would be covered by §441b’s ban on corporate-funded independent expenditures, thus subjecting the corporation to civil and criminal penalties under §437g. In December 2007, Citizens United sought declaratory and injunctive relief against the FEC. It argued that (1) §441b is unconstitutional as applied to Hillary; and (2) BCRA’s disclaimer and disclosure requirements, BCRA §§201 and 311, 116 Stat. 88, 105, are unconstitutional as applied to Hillary and to the three ads for the movie.
*322 The District Court denied Citizens United’s motion for a preliminary injunction, 530 F. Supp. 2d 274 (DC 2008) (per curiam), and then granted the FEC’s motion for summary judgment, App. 261a-262a. See id., at 261a (“Based on the reasoning of our prior opinion, we find that the [FEC] is entitled to judgment as a matter of law. See Citizen[s] United v. FEC, 530 F. Supp. 2d 274 (D. D. C. 2008) (denying Citizens United’s request for a preliminary injunction)”). The court held that § 441b was facially constitutional under McConnell, and that §441b was constitutional as applied to Hillary because it was “susceptible of no other interpretation than to inform the electorate that Senator Clinton is unfit for office, that the United States would be a dangerous place in a President Hillary Clinton world, and that viewers should vote against her.” 530 F. Supp. 2d, at 279. The court also rejected Citizens United’s challenge to BCRA’s disclaimer and disclosure requirements. It noted that “the Supreme Court has written approvingly of disclosure provisions triggered by political speech even though the speech itself was constitutionally protected under the First Amendment.” Id., at 281.
We noted probable jurisdiction. 555 U. S. 1028 (2008). The case was reargued in this Court after the Court asked the parties to file supplemental briefs addressing whether we should overrule either or both Austin and the part of McConnell which addresses the facial validity of 2 U. S. C. § 441b. See 557 U. S. 932 (2009).
II
Before considering whether Austin should be overruled, we first address whether Citizens United’s claim that § 441b cannot be applied to Hillary may be resolved on other, narrower grounds.
A
Citizens United contends that § 441b does not cover Hillary, as a matter of statutory interpretation, because the film *323 does not qualify as an “electioneering communication.” §441b(b)(2). Citizens United raises this issue for the first time before us, but we consider the issue because “it was addressed by the court below.” Lebron v. National Railroad Passenger Corporation, 513 U. S. 374, 379 (1995); see 530 F. Supp. 2d, at 277, n. 6. Under the definition of electioneering communication, the video-on-demand showing of Hillary on cable television would have been a “cable . . . communication” that “referred] to a clearly identified candidate for Federal office” and that was made within 30 days of a primary election. 2 U. S. C. §434(f)(3)(A)(i). Citizens United, however, argues that Hillary was not “publicly distributed,” because a single video-on-demand transmission is sent only to a requesting cable converter box and each separate transmission, in most instances, will be seen by just one household — not 50,000 or more persons. 11 CFR § 100.29(a)(2); see § 100.29(b)(3)(ii).
This argument ignores the regulation’s instruction on how to determine whether a cable transmission “[c]an be received by 50,000 or more persons.” § 100.29(b)(3)(ii). The regulation provides that the number of people who can receive a cable transmission is determined by the number of cable subscribers in the relevant area. §§ 100.29(b)(7)(i)(G), (ii). Here, Citizens United wanted to use a cable video-on-demand system that had 34.5 million subscribers nationwide. App. 256a. Thus, Hillary could have been received by 50,000 persons or more.
One amici brief asks us, alternatively, to construe the condition that the communication “[c]an be received by 50,000 or more persons,” § 100.29(b)(3)(ii)(A), to require “a plausible likelihood that the communication will be viewed by 50,000 or more potential voters” — as opposed to requiring only that the communication is “technologically capable” of being seen by that many people, Brief for Former Officials of the American Civil Liberties Union 5. Whether the population and demographic statistics in a proposed viewing area consisted *324 of 50,000 registered voters — but not “infants, pre-teens, or otherwise electorally ineligible recipients” — would be a required determination, subject to judicial challenge and review, in any case where the issue was in doubt. Id., at 6.
In our view the statute cannot be saved by limiting the reach of 2 U. S. C. § 441b through this suggested interpretation. In addition to the costs and burdens of litigation, this result would require a calculation as to the number of people a particular communication is likely to reach, with an inaccurate estimate potentially subjecting the speaker to criminal sanctions. The First Amendment does not permit laws that force speakers to retain a campaign finance attorney, conduct demographic marketing research, or seek declaratory rulings before discussing the most salient political issues of our day. Prolix laws chill speech for the same reason that vague laws chill speech: People “of common intelligence must necessarily guess at [the law’s] meaning and differ as to its application.” Connally v. General Constr. Co., 269 U. S. 385, 391 (1926). The Government may not render a ban on political speech constitutional by carving out a limited exemption through an amorphous regulatory interpretation. We must reject the approach suggested by the amici. Section 441b covers Hillary.
B
Citizens United next argues that § 441b may not be applied to Hillary under the approach taken in WRTL. McConnell decided that §441b(b)(2)’s definition of an “electioneering communication” was facially constitutional insofar as it restricted speech that was “the functional equivalent of express advocacy” for or against a specific candidate. 540 U. S., at 206. WRTL then found an unconstitutional application of § 441b where the speech was not “express advocacy or its functional equivalent.” 551 U. S., at 481 (opinion of Roberts, C. J.). As explained by The Chief Justice’s controlling opinion in WRTL, the fimctional-equivalent test is objective: “[A] court should find that [a communication] is *325 the functional equivalent of express advocacy only if [it] is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate.” Id., at 469-470.
Under this test, Hillary is equivalent to express advocacy. The movie, in essence, is a feature-length negative advertisement that urges viewers to vote against Senator Clinton for President. In light of historical footage, interviews with persons critical of her, and voiceover narration, the film would be understood by most viewers as an extended criticism of Senator Clinton’s character and her fitness for the office of the Presidency. The narrative may contain more suggestions and arguments than facts, but there is little doubt that the thesis of the film is that she is unfit for the Presidency. The movie concentrates on alleged wrongdoing during the Clinton administration, Senator Clinton’s qualifications and fitness for office, and policies the commentators predict she would pursue if elected President. It calls Senator Clinton “Machiavellian,” App. 64a, and asks whether she is “the most qualified to hit the ground running if elected President,” id., at 88a. The narrator reminds viewers that “Americans have never been keen on dynasties” and that “a vote for Hillary is a vote to continue 20 years of a Bush or a Clinton in the White House,” id., at 143a-144a.
Citizens United argues that Hillary is just “a documentary film that examines certain historical events.” Brief for Appellant 35. We disagree. The movie’s consistent emphasis is on the relevance of these events to Senator Clinton’s candidacy for President. The narrator begins by asking “could [Senator Clinton] become the first female President in the history of the United States?” App. 35a. And the narrator reiterates the movie’s message in his closing line: “Finally, before America decides on our next president, voters should need no reminders of . . . what’s at stake — the well being and prosperity of our nation.” Id., at 144a-145a.
*326 As the District Court found, there is no reasonable inter-. pretation of Hillary other than as an appeal to vote against Senator Clinton. Under the standard stated in McConnell and further elaborated in WRTL, the film qualifies as the functional equivalent of express advocacy.
C
Citizens United further contends that § 441b should be invalidated as applied to movies shown through video-on-demand, arguing that this delivery system has a lower risk of distorting the political process than do television ads. Cf. McConnell, supra, at 207. On what we might call conventional television, advertising spots reach viewers who have chosen a channel or a program for reasons unrelated to the advertising. With video-on-demand, by contrast, the viewer selects a program after taking “a series of affirmative steps”: subscribing to cable; navigating through various menus; and selecting the program. See Reno v. American Civil Liberties Union, 521 U. S. 844, 867 (1997).
While some means of communication may be less effective than others at influencing the public in different contexts, any effort by the Judiciary to decide which means of communications are to be preferred for the particular type of message and speaker would raise questions as to the courts’ own lawful authority. Substantial questions would arise if courts were to begin saying what means of speech should be preferred or disfavored. And in all events, those differentiations might soon prove to be irrelevant or outdated by technologies that are in rapid flux. See Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 639 (1994).
Courts, too, are bound by the First Amendment. We must decline to draw, and then redraw, constitutional lines based on the particular media or technology used to disseminate political speech from a particular speaker. It must be noted, moreover, that this undertaking would require substantial litigation over an extended time, all to interpret a *327 law that beyond doubt discloses serious First Amendment flaws. The interpretive process itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable. First Amendment standards, however, “must give the benefit of any doubt to protecting rather than stifling speech.” WRTL, 551 U. S., at 469 (opinion of Roberts, C. J.) (citing New York Times Co. v. Sullivan, 376 U. S. 254, 269-270 (1964)).
D
Citizens United also asks us to carve out an exception to §441b’s expenditure ban for nonprofit corporate political speech funded overwhelmingly by individuals. As an alternative to reconsidering Austin, the Government also seems to prefer this approach. This line of analysis, however, would be unavailing.
In MCFL, the Court found unconstitutional §441b’s restrictions on corporate expenditures as applied to nonprofit corporations that were formed for the sole purpose of promoting political ideas, did not engage in business activities, and did not accept contributions from for-profit corporations or labor unions. 479 U. S., at 263-264; see also 11 CFR §114.10. BCRA’s so-called Wellstone Amendment applied §441b’s expenditure ban to all nonprofit corporations. See 2 U. S. C. §441b(e)(6); McConnell, 540 U. S., at 209. McConnell then interpreted the Wellstone Amendment to retain the MCFL exemption to §441b’s expenditure prohibition. 540 U. S., at 211. Citizens United does not qualify for the MCFL exemption, however, since some funds used to make the movie were donations from for-profit corporations.
The Government suggests we could find BCRA’s Wellstone Amendment unconstitutional, sever it from the statute, and hold that Citizens United’s speech is exempt from §441b’s ban under BCRA’s Snowe-Jeffords Amendment, §441b(c)(2). See Tr. of Oral Arg. 37-38 (Sept. 9, 2009). The Snowe-Jeffords Amendment operates as a backup provision that *328 only takes effect if the Wellstone Amendment is invalidated. See McConnell, supra, at 339 (Kennedy, J., concurring in judgment in part and dissenting in part). The Snowe-Jeffords Amendment would exempt from § 44 lb’s expenditure ban the political speech of certain nonprofit corporations if the speech were funded “exclusively” by individual donors and the funds were maintained in a segregated account. §441b(c)(2). Citizens United would not qualify for the Snowe-Jeffords exemption, under its terms as written, because Hillary was funded in part with donations from for-profit corporations.
Consequently, to hold for Citizens United on this argument, the Court would be required to revise the text of MCFL, sever BCRA’s Wellstone Amendment, §441b(c)(6), and ignore the plain text of BCRA’s Snowe-Jeffords Amendment, §441b(c)(2). If the Court decided to create a de minimis exception to MCFL or the Snowe-Jeffords Amendment, the result would be to allow for-profit corporate general treasury funds to be spent for independent expenditures that support candidates. There is no principled basis for doing this without rewriting Austin’s holding that the Government can restrict corporate independent expenditures for political speech.
Though it is true that the Court should construe statutes as necessary to avoid constitutional questions, the series of steps suggested would be difficult to take in view of the language of the statute. In addition to those difficulties the Government’s suggestion is troubling for still another reason. The Government does not say that it agrees with the interpretation it wants us to consider. See Supp. Brief for Appellee 3, n. 1 (“Some courts” have implied a de minimis exception, and “appellant would appear to be covered by these decisions”). Presumably it would find textual difficulties in this approach too. The Government, like any party, can make arguments in the alternative; but it ought to say if there is merit to an alternative proposal instead of *329 merely suggesting it. This is especially true in the context of the First Amendment. As the Government stated, this case “would require a remand” to apply a de minimis standard. Tr. of Oral Arg. 39 (Sept. 9, 2009). Applying this standard would thus require case-by-case determinations. But archetypical political speech would be chilled in the meantime. “'First Amendment freedoms need breathing space to survive.’” WRTL, supra, at 468-469 (opinion of Roberts, C. J.) (quoting NAACP v. Button, 371 U. S. 415, 433 (1963)). We decline to adopt an interpretation that requires intricate case-by-case determinations to verify whether political speech is banned, especially if we are convinced that, in the end, this corporation has a constitutional right to speak on this subject.
E
As the foregoing analysis confirms, the Court cannot resolve this ease on a narrower ground without chilling political speech, speech that is central to the meaning and purpose of the First Amendment. See Morse v. Frederick, 551 U. S. 393, 403 (2007). It is not judicial restraint to accept an unsound, narrow argument just so the Court can avoid another argument with broader implications. Indeed, a court would be remiss in performing its duties were it to accept an unsound principle merely to avoid the necessity of making a broader ruling. Here, the lack of a valid basis for an alternative ruling requires full consideration of the continuing effect of the speech suppression upheld in Austin.
Citizens United stipulated to dismissing count 5 of its complaint, which raised a facial challenge to § 441b, even though count 3 raised an as-applied challenge. See App. 23a (count 3: “As applied to Hillary, [§ 441b] is unconstitutional under the First Amendment guarantees of free expression and association”). The Government argues that Citizens United waived its challenge to Austin by dismissing count 5. We disagree.
*330 First, even if a party could somehow waive a facial challenge while preserving an as-applied challenge, that would not prevent the Court from reconsidering Austin or addressing the facial validity of § 441b in this case. “Our practice 'permit[s] review of an issue not pressed [below] so long as it has been passed upon . . . .’” Lebron, 513 U. S., at 379 (quoting United States v. Williams, 504 U. S. 36, 41 (1992); first alteration in original). And here, the District Court addressed Citizens United’s facial challenge. See 530 F. Supp. 2d, at 278 (“Citizens wants us to enjoin the operation of BCEA § 203 as a facially unconstitutional burden on the First Amendment right to freedom of speech”). In rejecting the claim, it noted that it “would have to overrule McConnell” for Citizens United to prevail on its facial challenge and that “[o]nly the Supreme Court may overrule its decisions.” Ibid, (citing Rodriguez de Quijas v. Shearson/American Express, Inc., 490 U. S. 477, 484 (1989)). The District Court did not provide much analysis regarding the facial challenge because it could not ignore the controlling Supreme Court decisions in Austin and McConnell. Even so, the District Court did '"pas[s] upon’” the issue. Lebron, supra, at 379. Furthermore, the District Court’s later opinion, which granted the FEC summary judgment, was “[b]ased on the reasoning of [its] prior opinion,” which included the discussion of the facial challenge. App. 261a (citing 530 F. Supp. 2d 274). After the District Court addressed the facial validity of the statute, Citizens United raised its challenge to Austin in this Court. See Brief for Appellant 30 ('Austin was wrongly decided and should be overruled”); id., at 30-32. In these circumstances, it is necessary to consider Citizens United’s challenge to Austin and the facial validity of § 441b’s expenditure ban.
Second, throughout the litigation, Citizens United has asserted a claim that the FEC has violated its First Amendment right to free speech. All concede that this claim is properly before us. And “ '[o]nce a federal claim is properly *331 presented, a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below.’ ” Lebron, supra, at 379 (quoting Yee v. Escondido, 503 U. S. 519, 534 (1992); alteration in original). Citizens United’s argument that Austin should be overruled is "not a new claim.” Lebron, 513 U. S., at 379. Rather, it is — at most — “a new argument to support what has been [a] consistent claim: that [the FEC] did not accord [Citizens United] the rights it was obliged to provide by the First Amendment.” Ibid.
Third, the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge. The distinction is both instructive and necessary, for it goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint. See United States v. Treasury Employees, 513 U. S. 454, 477-478 (1995) (contrasting “a facial challenge” with “a narrower remedy”). The parties cannot enter into a stipulation that prevents the Court from considering certain remedies if those remedies are necessary to resolve a claim that has been preserved. Citizens United has preserved its First Amendment challenge to §441b as applied to the facts of its case; and given all the circumstances, we cannot easily address that issue without assuming a premise — the permissibility of restricting corporate political speech — that is itself in doubt. See Fallon, As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1339 (2000) (“[0]nce a case is brought, no general categorical line bars a court from making broader pronouncements of invalidity in properly ‘as-applied’ cases”); id., at 1327-1328. As our request for supplemental briefing implied, Citizens United’s claim implicates the validity of Austin, which in turn implicates the facial validity of §441b.
When the statute now at issue came before the Court in McConnell, both the majority and the dissenting opinions *332 considered the question of its facial validity. The holding and validity of Austin were essential to the reasoning of the McConnell majority opinion, which upheld BCRA’s extension of § 441b. See 540 U. S., at 205 (quoting Austin, 494 U. S., at 660). McConnell permitted federal felony punishment for speech by all corporations, including nonprofit ones, that speak on prohibited subjects shortly before federal elections. See 540 U. S., at 203-209. Four Members of the McConnell Court would have overruled Austin, including Chief Justice Rehnquist, who had joined the Court’s opinion in Austin but reconsidered that conclusion. See 540 U. S., at 256-262 (Scalia, J., concurring in part, concurring in judgment in part, and dissenting in part); id., at 273-275 (Thomas, J., concurring in part, concurring in result in part, concurring in judgment in part, and dissenting in part); id., at 322-338 (opinion of Kennedy, J., joined by Rehnquist, C. J., and Scalia, J.). That inquiry into the facial validity of the statute was facilitated by the extensive record, which was “over 100,000 pages” long, made in the three-judge District Court. McConnell v. Federal Election Comm’n, 251 F. Supp. 2d 176, 209 (DC 2003) (per curiam) (McConnell I). It is not the case, then, that the Court today is premature in interpreting § 441b “ ‘on the basis of [a] factually barebones recor[d].’” Washington State Grange v. Washington State Republican Party, 552 U. S. 442, 450 (2008) (quoting Sabri v. United States, 541 U. S. 600, 609 (2004)).
The McConnell majority considered whether the statute was facially invalid. An as-applied challenge was brought in Wisconsin Right to Life, Inc. v. Federal Election Comm’n, 546 U. S. 410, 411-412 (2006) (per curiam), and the Court confirmed that the challenge could be maintained. Then, in WRTL, the controlling opinion of the Court not only entertained an as-applied challenge but also sustained it. Three Justices noted that they would continue to maintain the position that the record in McConnell demonstrated the invalidity of the Act on its face. 551 U. S., at 485-504 (opinion of *333 Scaua, J.). The controlling opinion in WRTL, which refrained from holding the statute invalid except as applied to the facts then before the Court, was a careful attempt to accept the-essential elements of the Court’s opinion in McConnell, while vindicating the First Amendment arguments made by the WRTL parties. 551 U. S., at 482 (opinion of Koberts, C. J.).
As noted above, Citizens United’s narrower arguments are not sustainable under a fair reading of the statute. In the exercise of its judicial responsibility, it is necessary then for the Court to consider the facial validity of § 441b. Any other course of decision would prolong the substantial, nationwide chilling effect caused by §441b’s prohibitions on corporate expenditures. Consideration of the facial validity of § 441b is further supported by the following reasons.
First is the uncertainty caused by the litigating position of the Government. As discussed above, see Part II-D, supra, the Government suggests, as an alternative argument, that an as-applied challenge might have merit. This argument proceeds on the premise that the nonprofit corporation involved here may have received only de minimis donations from for-profit corporations and that some nonprofit corporations may be exempted from the operation of the statute. The Government also suggests that an as-applied challenge to §441b’s ban on books may be successful, although it would defend §441b’s ban as applied to almost every other form of media including pamphlets. See Tr. of Oral Arg. 65-66 (Sept. 9, 2009). The Government thus, by its own position, contributes to the uncertainty that §441b causes. When the Government holds out the possibility of ruling for Citizens United on a narrow ground yet refrains from adopting that position, the added uncertainty demonstrates the necessity to address the question of statutory validity.
Second, substantial time would be required to bring clarity to the application of the statutory provision on these points *334 in order to avoid any chilling effect caused by some improper interpretation. See Part IX-C, supra. It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held. There are short timeframes in which speech can have influence. The need or relevance of the speech will often first be apparent at this stage in the campaign. The decision to speak is made in the heat of political campaigns, when speakers react to messages conveyed by others. A speaker’s ability to engage in political speech that could have a chance of persuading voters is stifled if the speaker must first commence a protracted lawsuit. By the time the lawsuit concludes, the election will be over and the litigants in most cases will have neither the incentive nor, perhaps, the resources to carry on, even if they could establish that the case is not moot because the issue is “capable of repetition, yet evading review.” WRTL, supra, at 462 (opinion of Roberts, C. J.) (citing Los Angeles v. Lyons, 461 U. S. 95, 109 (1983); Southern Pacific Terminal Co. v. ICC, 219 U. S. 498, 515 (1911)). Here, Citizens United decided to litigate its case to the end. Today, Citizens United finally learns, two years after the fact, whether it could have spoken during the 2008 Presidential primary— long after the opportunity to persuade primary voters has passed.
Third is the primary importance of speech itself to the integrity of the election process. As additional rules are created for regulating political speech, any speech arguably within their reach is chilled. See Part II-A, supra. Campaign finance regulations now impose “unique and complex rules” on “71 distinct entities.” Brief for Seven Former Chairmen of FEC et al. as Amici Curiae 11-12. These entities are subject to separate rules for 33 different types of political speech. Id., at 14-15, n. 10. The FEC has adopted 568 pages of regulations, 1,278 pages of explanations and justifications for those regulations, and 1,771 advisory opinions since 1975. See id., at 6, n. 7. In fact, after this Court in *335 WBTL adopted an objective “appeal to vote” test for determining whether a communication was the functional equivalent of express advocacy, 551 U. S., at 470 (opinion of Roberts, C. J.), the FEC adopted a two-part, 11-factor balancing test to implement WRTL’s ruling. See 11 CFR §114.15; Brief for Wyoming Liberty Group et al. as Amici Curiae 17-27 (filed Jan. 15, 2009).
This regulatory scheme may not be a prior restraint on speech in the strict sense of that term, for prospective speakers are not compelled by law to seek an advisory opinion from the FEC before the speech takes place. Cf. Near v. Minnesota ex rel. Olson, 283 U. S. 697, 712-713 (1931). As a practical matter, however, given the complexity of the regulations and the deference courts show to administrative determinations, a speaker who wants to avoid threats of criminal liability and the heavy costs of defending against FEC enforcement must ask a governmental agency for prior permission to speak. See 2 U. S. C. §437f; 11 CFR §112.1. These onerous restrictions thus function as the equivalent of prior restraint by giving the FEC power analogous to licensing laws implemented in 16th- and 17th-century England, laws and governmental practices of the sort that the First Amendment was drawn to prohibit. See Thomas v. Chicago Park Dist., 534 U. S. 316, 320 (2002); Lovell v. City of Griffin, 303 U. S. 444, 451-452 (1938); Near, supra, at 713-714. Because the EEC’s “business is to censor, there inheres the danger that [it] may well be less responsive than a court— part of an independent branch of government — to the constitutionally protected interests in free expression.” Freedman v. Maryland, 380 U. S. 51, 57-58 (1965). When the FEC issues advisory opinions that prohibit speech, “[m]any persons, rather than undertake the considerable burden (and sometimes risk) of vindicating their rights through case-by-case litigation, will choose simply to abstain from protected speech — harming not only themselves but society as a whole, which is deprived of an uninhibited marketplace of ideas.” *336 Virginia v. Hicks, 539 U. S. 113, 119 (2003) (citation omitted). Consequently, “the censor’s determination may in practice be final.” Freedman, supra, at 58.
This is precisely what WBTL sought to avoid. WRTL said that First Amendment standards “must eschew ‘the open-ended rough-and-tumble of factors,’ which ‘invit[es] complex argument in a trial court and a virtually inevitable appeal.’ ” 551 U. S., at 469 (opinion of Roberts, C. J.) (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U. S. 527, 547 (1995); alteration in original). Yet, the FEC has created a regime that allows it to select what political speech is safe for public consumption by applying ambiguous tests. If parties want to avoid litigation and the possibility of civil and criminal penalties, they must either refrain from speaking or ask the FEC to issue an advisory opinion approving of the political speech in question. Government officials pore over each word of a text to see if, in their judgment, it accords with the 11-factor test they have promulgated. This is an unprecedented governmental intervention into the realm of speech.
The ongoing chill upon speech that is beyond all doubt protected makes it necessary in this case to invoke the earlier precedents that a statute which chills speech can and must be invalidated where its facial invalidity has been demonstrated. See WRTL, supra, at 482-483 (Alito, J., concurring); Thornhill v. Alabama, 310 U. S. 88, 97-98 (1940). For these reasons we find it necessary to reconsider Austin.
III
The First Amendment provides that “Congress shall make no law... abridging the freedom of speech.” Laws enacted to control or suppress speech may operate at different points in the speech process. The following are just a few examples of restrictions that have been attempted at different stages of the speech process — all laws found to be invalid: restrictions requiring a permit at the outset, Watchtower *337 Bible & Tract Soc. of N. Y., Inc. v. Village of Stratton, 536 U. S. 150, 153 (2002); imposing a burden by impounding proceeds on receipts or royalties, Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U. S. 105, 108, 123 (1991); seeking to exact a cost after the speech occurs, New York Times Co. v. Sullivan, 376 U. S., at 267; and subjecting the speaker to criminal penalties, Brandenburg v. Ohio, 395 U. S. 444, 445 (1969) (per curiam).
The law before us is an outright ban, backed by criminal sanctions. Section 441b makes it a felony for all corporations — including nonprofit advocacy corporations — either to expressly advocate the election or defeat of candidates or to broadcast electioneering communications within 30 days of a primary election and 60 days of a general election. Thus, the following acts would all be felonies under §441b: The Sierra Club runs an ad, within the crucial phase of 60 days before the general election, that exhorts the public to disapprove of a Congressman who favors logging in national forests; the National Rifle Association publishes a book urging the public to vote for the challenger because the incumbent U. S. Senator supports a handgun ban; and the American Civil Liberties Union creates a Web site telling the public to vote for a Presidential candidate in light of that candidate’s defense of free speech. These prohibitions are classic examples of censorship.
Section 441b is a ban on corporate speech notwithstanding the fact that a PAC created by a corporation can still speak. See McConnell, 540 U. S., at 330-333 (opinion of Kennedy, J.). A PAC is a separate association from the corporation. So the PAC exemption from §441b’s expenditure ban, §441b(b)(2), does not allow corporations to speak. Even if a PAC could somehow allow a corporation to speak — and it does not — the option to form PACs does not alleviate the First Amendment problems with §441b. PACs are burdensome alternatives; they are expensive to administer and subject to extensive regulations. For example, every PAC *338 must appoint a treasurer, forward donations to the treasurer promptly, keep detailed records of the identities of the persons making donations, preserve receipts for three years, and file an organization statement and report changes to this information within 10 days. See id., at 330-332 (quoting MCFL, 479 U. S., at 253-254 (opinion of Brennan, J.)).
And that is just the beginning: PACs must file detailed monthly reports with the FEC, which are due at different times depending on the type of election that is about to occur:
“ These reports must contain information regarding the amount of cash on hand; the total amount of receipts, detailed by 10 different categories; the identification of each political committee and candidate’s authorized or affiliated committee making contributions, and any persons making loans, providing rebates, refunds, dividends, or interest or any other offset to operating expenditures in an aggregate amount over $200; the total amount of all disbursements, detailed by 12 different categories; the names of all authorized or affiliated committees to whom expenditures aggregating over $200 have been made; persons to whom loan repayments or refunds have been made; the total sum of all contributions, operating expenses, outstanding debts and obligations, and the settlement terms of the retirement of any debt or obligation.’ ” 540 U. S., at 331-332 (quoting MCFL, supra, at 253-254).
PACs have to comply with these regulations just to speak. This might explain why fewer than 2,000 of the millions of corporations in this country have PACs. See Brief for Seven Former Chairmen of FEC et al. as Amici Curiae 11 (citing FEC, Summary of PAC Activity 1990-2006, online at http://www.fec.gov/press/press2007/20071009pac/sumhistory .pdf (as visited Jan. 18, 2010, and available in Clerk of Court’s case file)); IRS, Statistics of Income: 2006, Corporation In *339 come Tax Returns 2 (2009) (hereinafter Statistics of Income) (5.8 million for-profit corporations filed 2006 tax returns). PACs, furthermore, must exist before they can speak. Given the onerous restrictions, a corporation may not be able to establish a PAC in time to make its views known regarding candidates and issues in a current campaign.
Section 441b’s prohibition on corporate independent expenditures is thus a ban on speech. As a “restriction on the amount of money a person or group can spend on political communication during a campaign,” that statute “necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.” Buckley v. Valeo, 424 U. S. 1, 19 (1976) (per curiam). Were the Court to uphold these restrictions, the Government could repress speech by silencing certain voices at any of the various points in the speech process. See McConnell, supra, at 251 (opinion of Scalia, J.) (Government could repress speech by “attacking all levels of the production and dissemination of ideas,” for “effective public communication requires the speaker to make use of the services of others”). If §441b applied to individuals, no one would believe that it is merely a time, place, or manner restriction on speech. Its purpose and effect are to silence entities whose voices the Government deems to be suspect.
Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. See Buckley, supra, at 14-15 (“In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential”). The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it. The First Amendment “ 'has its fullest and most urgent application’ to speech uttered during a campaign for political office.” Eu v. San Francisco County Democratic Central Comm., 489 *340 U. S. 214, 223 (1989) (quoting Monitor Patriot Co. v. Roy, 401 U. S. 265, 272 (1971)); see Buckley, supra, at 14 (“Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution”).
For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are “subject to strict scrutiny,” which requires the Government to prove that the restriction “furthers a compelling interest and is narrowly tailored to achieve that interest.” WRTL, 551 U. S., at 464 (opinion of Roberts, C. J.). While it might be maintained that political speech simply cannot be banned or restricted as a categorical matter, see Simon & Schuster, 502 U. S., at 124 (Kennedy, J., concurring in judgment), the quoted language from WRTL provides a sufficient framework for protecting the relevant First Amendment interests in this case. We shall employ it here.
Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints. See, e. g., United States v. Playboy Entertainment Group, Inc., 529 U. S. 803, 813 (2000) (striking dowm content-based restriction). Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others. See First Nat. Bank of Boston v. Bellotti, 435 U. S. 765, 784 (1978). As instruments to censor, these categories are interrelated: Speech restrictions based on the identity of the speaker are all too often simply a means to control content.
Quite apart from the purpose or effect of regulating content, moreover, the Government may commit a constitutional wrong when by law it identifies certain preferred speakers. By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, *341 standing, and respect for the speaker’s voice. The Government may not by these means deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration. The First Amendment protects speech and speaker, and the ideas that flow from each.
The Court has upheld a narrow class of speech restrictions that operate to the disadvantage of certain persons, but these rulings were based on an interest in allowing governmental entities to perform their functions. See, e. g., Bethel School Dist. No. 403 v. Fraser, 478 U. S. 675, 683 (1986) (protecting the “function of public school education”); Jones v. North Carolina Prisoners’ Labor Union, Inc., 433 U. S. 119, 129 (1977) (furthering “the legitimate penological objectives of the corrections system” (internal quotation marks omitted)); Parker v. Levy, 417 U. S. 733, 759 (1974) (ensuring “the capacity of the Government to discharge its [military] responsibilities” (internal quotation marks omitted)); Civil Service Comm’n v. Letter Carriers, 413 U. S. 548, 557 (1973) (“[F]ederal service should depend upon meritorious performance rather than political service”). The corporate independent expenditures at issue in this ease, however, would not interfere with governmental functions, so these cases are inapposite. These precedents stand only for the proposition that there are certain governmental functions that cannot operate without some restrictions on particular kinds of speech. By contrast, it is inherent in the nature of the political process that voters must be free to obtain information from diverse sources in order to determine how to cast their votes. At least before Austin, the Court had not allowed the exclusion of a class of speakers from the general public dialogue.
We find no basis for the proposition that, in the context of political speech, the Government may impose restrictions on certain disfavored speakers. Both history and logic lead us to this conclusion.
*342 A
1
The Court has recognized that First Amendment protection extends to corporations. Bellotti, supra, at 778, n. 14 (citing Limnark Associates, Inc. v. Willingboro, 431 U. S. 85 (1977) ; Time, Inc. v. Firestone, 424 U. S. 448 (1976); Doran v. Salem Inn, Inc., 422 U. S. 922 (1975); Southeastern Promotions, Ltd. v. Conrad, 420 U. S. 546 (1975); Cox Broadcasting Corp. v. Cohn, 420 U. S. 469 (1975); Miami Herald Publishing Co. v. Tornillo, 418 U. S. 241 (1974); New York Times Co. v. United States, 403 U. S. 713 (1971) (per curiam); Time, Inc. v. Hill, 385 U. S. 374 (1967); New York Times Co. v. Sullivan, 376 U. S. 254; Kingsley Int’l Pictures Corp. v. Regents of Univ. of N. Y., 360 U. S. 684 (1959); Joseph Burstyn, Inc. v. Wilson, 343 U. S. 495 (1952)); see, e. g., Turner Broadcasting System, Inc. v. FCC, 520 U. S. 180 (1997); Denver Area Ed. Telecommunications Consortium, Inc. v. FCC, 518 U. S. 727 (1996); Turner, 512 U. S. 622; Simon & Schuster, 502 U. S. 105; Sable Communications of Cal., Inc. v. FCC, 492 U. S. 115 (1989); Florida Star v. B. J. F., 491 U. S. 524 (1989); Philadelphia Newspapers, Inc. v. Hepps, 475 U. S. 767 (1986); Landmark Communications, Inc. v. Virginia, 435 U. S. 829 (1978) ; Young v. American Mini Theatres, Inc., 427 U. S. 50 (1976); Gertz v. Robert Welch, Inc., 418 U. S. 323 (1974); Greenbelt Cooperative Publishing Assn., Inc. v. Bresler, 398 U. S. 6 (1970).
This protection has been extended by explicit holdings to the context of political speech. See, e. g., Button, 371 U. S., at 428-429; Grosjean v. American Press Co., 297 U. S. 233, 244 (1936). Under the rationale of these precedents, political speech does not lose First Amendment protection “simply because its source is a corporation.” Bellotti, supra, at 784; see Pacific Gas & Elec. Co. v. Public Util. Comm’n of Cal., 475 U. S. 1, 8 (1986) (plurality opinion) (“The identity of the speaker is not decisive in determining whether speech is pro *343 tected. Corporations and other associations, like individuals, contribute to the ‘discussion, debate, and the dissemination of information and ideas’ that the First Amendment seeks to foster” (quoting Bellotti, 435 U. S., at 783)). The Court has thus rejected the argument that political speech of corporations or other associations should be treated differently under the First Amendment simply because such associations are not “natural persons.” Id., at 776; see id., at 780, n. 16. Cf. id., at 828 (Rehnquist, J., dissenting).
At least since the latter part of the 19th century, the laws of some States and of the United States imposed a ban on corporate direct contributions to candidates. See B. Smith, Unfree Speech: The Folly of Campaign Finance Reform 23 (2001). Yet not until 1947 did Congress first prohibit independent expenditures by corporations and labor unions in §304 of the Labor Management Relations Act, 1947, 61 Stat. 159 (codified at 2 U. S. C. §251 (1946 ed., Supp. I)). In passing this Act Congress overrode the veto of President Truman, who warned that the expenditure ban was a “dangerous intrusion on free speech.” Message from the President of the United States, H. R. Doc. No. 334, 80th Cong., 1st Sess., 9 (1947).
For almost three decades thereafter, the Court did not reach the question whether restrictions on corporate and union expenditures are constitutional. See WRTL, 551 U. S., at 502 (opinion of Scalia, J.). The question was in the background of United States v. CIO, 335 U. S. 106 (1948). There, a labor union endorsed a congressional candidate in its weekly periodical. The Court stated that “the gravest doubt would arise in our minds as to [the federal expenditure prohibition’s] constitutionality” if it were construed to suppress that writing. . Id., at 121. The Court engaged in statutory interpretation and found the statute did not cover the publication. Id., at 121-122, and n. 20. Four Justices, however, said they would reach the constitutional question and invalidate the Labor-Management Relations Act’s expendi *344 ture ban. Id., at 155 (Rutledge, J., joined by Black, Douglas, and Murphy, JJ., concurring in result). The concurrence explained that any “ 'undue influence’ ” generated by a speaker’s “large expenditures” was outweighed “by the loss for democratic processes resulting from the restrictions upon free and full public discussion.” Id., at 143.
In United States v. Automobile Workers, 352 U. S. 567 (1957), the Court again encountered the independent expenditure ban, which had been recodified at 18 U. S. C. § 610 (1952 ed.). See 62 Stat. 723-724. After holding only that a union television broadcast that endorsed candidates was covered by the statute, the Court “[r]efus[ed] to anticipate constitutional questions” and remanded for the trial to proceed. 352 U. S., at 591. Three Justices dissented, arguing that the Court should have reached the constitutional question and that the ban on independent expenditures was unconstitutional:
“Under our Constitution it is We The People who are sovereign. The people have the final say. The legislators are their spokesmen. The people determine through their votes the destiny of the nation. It is therefore important — vitally important — that all channels of communication be open to them during every election, that no point of view be restrained or barred, and that the people have access to the views of every group in the community.” Id., at 593 (opinion of Douglas, J., joined by Warren, C. J., and Black, J.).
The dissent concluded that deeming a particular group “too powerful” was not a “justificatio[n] for withholding First Amendment rights from any group — labor or corporate.” Id., at 597. The Court did not get another opportunity to consider the constitutional question in that case; for after a remand, a jury found the defendants not guilty. See Hayward, Revisiting the Fable of Reform, 45 Harv. J. Legis. 421, 463 (2008).
*345 Later, in Pipefitters v. United States, 407 U. S. 385, 400-401 (1972), the Court reversed a conviction for expenditure of union funds for political speech — again without reaching the constitutional question. The Court would not resolve that question for another four years.
2
In Buckley, 424 U. S. 1, the Court addressed various challenges to the Federal Election Campaign Act of 1971 (FECA) as amended in 1974. These amendments created 18 U. S. C. § 608(e) (1970 ed., Supp. V), see 88 Stat. 1265, an independent expenditure ban separate from §610 that applied to individuals as well as corporations and labor unions, Buckley, 424 U. S., at 23, 39, and n. 45.
Before addressing the constitutionality of §608(e)’s independent expenditure ban, Buckley first upheld § 608(b), FECA’s limits on direct contributions to candidates. The Buckley Court recognized a “sufficiently important” governmental interest in “the prevention of corruption and the appearance of corruption.” Id., at 25; see id., at 26. This followed from the Court’s concern that large contributions could be given “to secure a political quid pro quo.” Ibid.
The Buckley Court explained that the potential for quid pro quo corruption distinguished direct contributions to candidates from independent expenditures. The Court emphasized that “the independent expenditure ceiling . . . fails to serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process,” id., at 47-48, because “[t]he absence of prearrangement and coordination ... alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate,” id., at 47. Buckley invalidated § 608(e)’s restrictions on independent expenditures, with only one Justice dissenting. See Federal Election Comm’n v. National Conservative Political Action Comm., 470 U. S. 480, 491, n. 3 (1985) (NCPAC).
*346 Buckley did not consider § 610’s separate ban on corporate and union independent expenditures, the prohibition that had also been in the background in CIO, Automobile Workers, and Pipefitters. Had § 610 been challenged in the wake of Buckley, however, it could not have been squared with the reasoning and analysis of that precedent. See WRTL, 551 U. S., at 487 (opinion of Scalia, J.) (“Buckley might well have been the last word on limitations on independent expenditures”); Austin, 494 U. S., at 683 (SCALIA, J., dissenting). The expenditure ban invalidated in Buckley, § 608(e), applied to corporations and unions, 424 U. S., at 23, 39, n. 45; and some of the prevailing plaintiffs in Buckley were corporations, id., at 8. The Buckley Court did not invoke the First Amendment’s overbreadth doctrine, see Broadrick v. Oklahoma, 413 U. S. 601, 615 (1973), to suggest that § 608(e)’s expenditure ban would have been constitutional if it had applied only to corporations and not to individuals, 424 U. S., at 50. Buckley cited with approval the Automobile Workers dissent, which argued that §610 was unconstitutional. 424 U. S., at 43 (citing 352 U. S., at 595-596 (opinion of Douglas, J.)).
Notwithstanding this precedent, Congress recodified § 61Q’s corporate and union expenditure ban at 2 U. S. C. § 441b four months after Buckley was decided. See 90 Stat. 490. Section 441b is the independent expenditure restriction challenged here.
Less than two years after Buckley, Bellotti, 435 U. S. 765, reaffirmed the First Amendment principle that the Government cannot restrict political speech based on the speaker’s corporate identity. Bellotti could not have been clearer when it struck down a state-law prohibition on corporate independent expenditures related to referenda issues:
“We thus find no support in the First... Amendment, or in the decisions of this Court, for the proposition that speech that otherwise would be within the protection of the First Amendment loses that protection simply be *347 cause its source is a corporation that cannot prove, to the satisfaction of a court, a material effect on its business or property. . . . [That proposition] amounts to an impermissible legislative prohibition of speech based on the identity of the interests that spokesmen may represent in public debate over controversial issues and a requirement that the speaker have a sufficiently great interest in the subject to justify communication.
“In the realm of protected speech, the legislature is constitutionally disqualified from dictating the subjects about which persons may speak and the speakers who may address a public issue.” Id., at 784-785.
It is important to note that the reasoning and holding of Bellotti did not rest on the existence of a viewpoint-discriminatory statute. It rested on the principle that the Government lacks the power to ban corporations from speaking.
Bellotti did not address the constitutionality of the State’s ban on corporate independent expenditures to support candidates. In our view, however, that restriction would have been unconstitutional under Bellotti’s central principle: that the First Amendment does not allow political speech restrictions based on a speaker’s corporate identity. See ibid.
3
Thus the law stood until Austin. Austin “uph[eld] a direct restriction on the independent expenditure of funds for political speech for the first time in [this Court’s] history.” 494 U. S., at 695 (Kennedy, J., dissenting). There, the Michigan Chamber of Commerce sought to use general treasury funds to run a newspaper ad supporting a specific candidate. Michigan law, however, prohibited corporate independent expenditures that supported or opposed any candidate for state office. A violation of the law was punishable as a felony. The Court sustained the speech prohibition.
*348 To bypass Buckley and Bellotti, the Austin Court identified a new governmental interest in limiting political speech: an antidistortion interest. Austin found a compelling governmental interest in preventing “the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public’s support for the corporation’s political ideas.” 494 U. S., at 660; see id., at 659 (citing MCFL, 479 U. S., at 257; NCPAC, 470 U. S., at 500-501).
B
The Court is thus confronted with conflicting lines of precedent: a pre-Austin line that forbids restrictions on political speech based on the speaker’s corporate identity and a post-Austin line that permits them. No case before Austin had held that Congress could prohibit independent expenditures for political speech based on the speaker’s corporate identity. Before Austin, Congress had enacted legislation for this purpose, and the Government urged the same proposition before this Court. See MCFL, supra, at 257 (FEC posited that Congress intended to “curb the political influence of ‘those who exercise control over large aggregations of capital’” (quoting Automobile Workers, 352 U. S., at 585)); California Medical Assn. v. Federal Election Comm’n, 453 U. S. 182, 201 (1981) (Congress believed that “differing structures and purposes” of corporations and unions “may require different forms of regulation in order to protect the integrity of the electoral process”). In neither of these cases did the Court adopt the proposition.
In its defense of the corporate-speech restrictions in § 441b, the Government notes the antidistortion rationale on which Austin and its progeny rest in part, yet it all but abandons reliance upon it. It argues instead that two other compelling interests support Austin’s holding that corporate expenditure restrictions are constitutional: an anticorruption interest, see 494 U. S., at 678 (Stevens, J., concurring), and *349 a shareholder-protection interest, see id., at 674-675 (Brennan, J., concurring). We consider the three points in turn.
1
As for Austin’s antidistortion rationale, the Government does little to defend it. See Tr. of Oral Arg. 45-48 (Sept. 9, 2009). And with good reason, for the rationale cannot support §441b.
If the First Amendment has any force, it prohibits Congress from fining or jailing citizens, or associations of citizens, for simply engaging in political speech. If the antidistortion rationale were to be accepted, however, it would permit Government to ban political speech simply because the speaker is an association that has taken on the corporate form. The Government contends that Austin permits it to ban corporate expenditures for almost all forms of communication stemming from a corporation. See Part II-E, supra; Tr. of Oral Arg. 66 (Sept. 9,2009); see also id., at 26-81 (Mar. 24, 2009). If Austin were correct, the Government could prohibit a corporation from expressing political views in media beyond those presented here, such as by printing books. The Government responds “that the FEC has never applied this statute to a book,” and if it did, “there would be quite [a] good as-applied challenge.” Tr. of Oral Arg. 65 (Sept. 9,2009). This troubling assertion of brooding governmental power cannot be reconciled with the confidence and stability in civic discourse that the First Amendment must secure.
Political speech is “indispensable to decisionmaking in a democracy, and this is no less true because the speech comes from a corporation rather than an individual.” Bellotti, 435 U. S., at 777 (footnote omitted); see ibid, (the worth of speech “does not depend upon the identity of its source, whether corporation, association, union, or individual”); Buckley, 424 U. S., at 48-49 (“[T]he concept that government may restrict the speech of some elements of our society in order to en *350 hance the relative voice of others is wholly foreign to the First Amendment”); Automobile Workers, supra, at 597 (Douglas, J., dissenting); CIO, 335 U. S., at 154-155 (Rutledge, J., concurring in result). This protection for speech is inconsistent with Austin’s antidistortion rationale. Austin sought to defend the antidistortion rationale as a means to prevent corporations from obtaining “'an unfair advantage in the political marketplace’ ” by using “ ‘resources amassed in the economic marketplace.’ ” 494 U. S., at 659 (quoting MCFL, supra, at 257). But Buckley rejected the premise that the Government has an interest “in equalizing the relative ability of individuals and groups to influence the outcome of elections.” 424 U. S., at 48; see Bellotti, supra, at 791, n. 30. Buckley was specific in stating that “the skyrocketing cost of political campaigns” could not sustain the governmental prohibition. 424 U. S., at 26. The First Amendment’s protections do not depend on the speaker’s “financial ability to engage in public discussion.” Id., at 49.
The Court reaffirmed these conclusions when it invalidated the BCRA provision that increased the cap on contributions to one candidate if the opponent made certain expenditures from personal funds. See Davis v. Federal Election Comm’n, 554 U. S. 724, 742 (2008) (“Leveling electoral opportunities means making and implementing judgments about which strengths should be permitted to contribute to the outcome of an election. The Constitution, however, confers upon voters, not Congress, the power to choose the Members of the House of Representatives, Art. I, § 2, and it is a dangerous business for Congress to use the election laws to influence the voters’ choices”). The rule that political speech cannot be limited based on a speaker’s wealth is a necessary consequence of the premise that the First Amendment generally prohibits the suppression of political speech based on the speaker’s identity.
Either as support for its antidistortion rationale or as a further argument, the Austin majority undertook to distin *351 guish wealthy individuals from corporations on the ground that “[s]tate law grants corporations special advantages— such as limited liability, perpetual life, and favorable treatment of the accumulation and distribution of assets.” 494 U. S., at 658-659. This does not suffice, however, to allow laws prohibiting speech. “It is rudimentary that the State cannot exact as the price of those special advantages the forfeiture of First Amendment rights.” Id., at 680 (Scalia, J., dissenting).
It is irrelevant for purposes of the First Amendment that corporate funds may “have little or no correlation to the public’s support for the corporation’s political ideas.” Id., at 660 (majority opinion). All speakers, including individuals and the media, use money amassed from the economic marketplace to fund their speech. The First Amendment protects the resulting speech, even if it was enabled by economic transactions with persons or entities who disagree with the speaker’s ideas. See id., at 707 (Kennedy, J., dissenting) (“Many persons can trace their funds to corporations, if not in the form of donations, then in the form of dividends, interest, or salary”).
Austin’s antidistortion rationale would produce the dangerous, and unacceptable, consequence that Congress could ban political speech of media corporations. See McConnell, 540 U. S., at 283 (opinion of Thomas, J.) (“The chilling endpoint of the Court’s reasoning is not difficult to foresee: outright regulation of the press”). Cf. Tornillo, 418 U. S., at 250 (alleging the existence of “vast accumulations of unreviewable power in the modern media empires”). Media corporations are now exempt from §441b’s ban on corporate expenditures. See 2 U. S. C. §§ 431(9)(B)(i), 434(f)(3)(B)(i). Yet media corporations accumulate wealth with the help of the corporate form, the largest media corporations have “immense aggregations of wealth,” and the views expressed by media corporations often “have little or no correlation to the public’s support” for those views. Austin, 494 U. S., at 660. *352 Thus, under the Government’s reasoning, wealthy media corporations could have their voices diminished to put them on par with other media entities. There is no precedent for permitting this under the First Amendment.
The media exemption discloses further difficulties with the law now under consideration. There is no precedent supporting laws that attempt to distinguish between corporations which are deemed to be exempt as media corporations and those which are not. “We have consistently rejected the proposition that the institutional press has any constitutional privilege beyond that of other speakers.” Id., at 691 (Scalia, J., dissenting) (citing Bellotti, 435 U. S., at 782); see Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U. S. 749, 784 (1985) (Brennan, J., joined by Marshall, Blackmun, and Stevens, JJ., dissenting); id., at 773 (White, J., concurring in judgment). With the advent of the Internet and the decline of print and broadcast media, moreover, the line between the media and others who wish to comment on political and social issues becomes far more blurred.
The law’s exception for media corporations is, on its own terms, all but an admission of the invalidity of the antidistortion rationale. And the exemption results in a further, separate reason for finding this law invalid: Again by its own terms, the law exempts some corporations but covers others, even though both have the need or the motive to communicate their views. The exemption applies-to media corporations owned or controlled by corporations that have diverse and substantial investments and participate in endeavors other than news. So even assuming the most doubtful proposition that a news organization has a right to speak when others do not, the exemption would allow a conglomerate that owns both a media business and ah unrelated business to influence or control the media in order to advance its overall business interest. At the same time, some other corporation, with an identical business interest but no media outlet in its ownership structure, would be forbidden to speak or *353 inform the public about the same issue. This differential treatment cannot be squared with the First Amendment.
There is simply no support for the view that the First Amendment, as originally understood, would permit the suppression of political speech by media corporations. The Framers may not have anticipated modern business and media corporations. See McIntyre v. Ohio Elections Comm’n, 514 U. S. 334, 360-361 (1995) (Thomas, J., concurring in judgment). Yet television networks and maj or newspapers owned by media corporations have become the most important means of mass communication in modern times. The First Amendment was certainly not understood to condone the suppression of political speech in society’s most salient media. It was understood as a response to the repression of speech and the press that had existed in England and the heavy taxes on the press that were imposed in the Colonies. See McConnell, supra, at 252-253 (opinion of Scalia, J.); Grosjean, 297 U. S., at 245-248; Near, 283 U. S., at 713-714. The great debates between the Federalists and the Anti-Federalists over our founding document were published and expressed in the most important means of mass communication of that era — newspapers owned by individuals. See McIntyre, 514 U. S., at 341-343; id., at 367 (Thomas, J., concurring in judgment). At the founding, speech was open, comprehensive, and vital to society’s definition of itself; there were no limits on the sources of speech and knowledge. See B. Bailyn, Ideological Origins of the American Revolution 5 (1967) (“Any number of people could join in such proliferating polemics, and rebuttals could come from all sides”); G. Wood, Creation of the American Republic 1776-1787, p. 6 (1969) (“[I]t is not surprising that the intellectual sources of [the Americans’] Revolutionary thought were profuse and various”). The Framers may have been unaware of certain types of speakers or forms of communication, but that does not mean that those speakers and media are entitled to less First Amendment protection than those types of speakers *354 and media that provided the means of communicating political ideas when the Bill of Rights was adopted.
Austin interferes with the “open marketplace” of ideas protected by the First Amendment. New York State Bd. of Elections v. Lopez Torres, 552 U. S. 196, 208 (2008); see ibid. (ideas “may compete” in this marketplace “without government interference”); McConnell, 540 U. S., at 274 (opinion of Thomas, J.). It permits the Government to ban the political speech of millions of associations of citizens. See Statistics of Income 2 (5.8 million for-profit corporations filed 2006 tax returns). Most of these are small corporations without large amounts of wealth. See Supp. Brief for Chamber of Commerce of the United States of America as Amicus Curiae 1, 3 (96% of the 3 million businesses that belong to the U. S. Chamber of Commerce have fewer than 100 employees); M. Keightley, Congressional Research Service Report for Congress, Business Organizational Choices: Taxation and Responses to Legislative Changes 10 (2009) (more than 75% of corporations whose income is taxed under federal law, see 26 U. S. C. § 301, have less than $1 million in receipts per year). This fact belies the Government’s argument that the statute is justified, on the ground that it prevents the “distorting effects of immense aggregations of wealth.” Austin, 494 U. S., at 660. It is not even aimed at amassed wealth.
The censorship we now confront is vast in its reach. The Government has “muffle[d] the voices that best represent the most significant segments of the economy.” McConnell, supra, at 257-258 (opinion of Scalia, J.). And “the electorate [has been] deprived of information, knowledge and opinion vital to its function.” CIO, 335 U. S., at 144 (Rutledge, J., concurring in result). By suppressing the speech of manifold corporations, both for-profit and nonprofit, the Government prevents their voices and viewpoints from reaching the public and advising voters on which persons or entities are hostile to their interests. Factions will necessarily form in our Republic, but the remedy of “destroying the liberty” of *355 some factions is “worse than the disease.” The Federalist No. 10, p. 130 (B. Wright ed. 1961) (J. Madison). Factions should be checked by permitting them all to speak, see ibid., and by entrusting the people to judge what is true and what is false.
The purpose and effect of this law is to prevent corporations, including small and nonprofit corporations, from presenting both facts and opinions to the public. This makes Austin’s antidistortion rationale all the more an aberration. “[T]he First Amendment protects the right of corporations to petition legislative and administrative bodies.” Bellotti, 435 U. S., at 792, n. 31 (citing California Motor Transport Co. v. Trucking Unlimited, 404 U. S. 508, 510-511 (1972); Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U. S. 127, 137-138 (1961)). Corporate executives and employees counsel Members of Congress and Presidential administrations on many issues, as a matter of routine and often in private. An amici brief filed on behalf of Montana and 25 other States notes that lobbying and corporate communications with elected officials occur on a regular basis. Brief for State of Montana et al. 19. When that phenomenon is coupled with § 441b, the result is that smaller or nonprofit corporations cannot raise a voice to object when other corporations, including those with vast wealth, are cooperating with the Government. That cooperation may sometimes be voluntary, or it may be at the demand of a Government official who uses his or her authority, influence, and power to threaten corporations to support the Government’s policies. Those kinds of interactions are often unknown and unseen. The speech that §441b forbids, though, is public, and all can judge its content and purpose. References to massive corporate treasuries should not mask the real operation of this law. Rhetoric ought not obscure reality.
Even if § 441b’s expenditure ban were constitutional, wealthy corporations could still lobby elected officials, al *356 though smaller corporations may not have the resources to do so. And wealthy individuals and unincorporated associations can spend unlimited amounts on independent expenditures. See, e. g., WRTL, 551 U. S., at 503-504 (opinion of Scalia, J.) (“In the 2004 election cycle, a mere 24 individuals contributed an astounding total of $142 million to [26 U. S. C. §527 organizations]”). Yet certain disfavored associations of citizens — those that have taken on the corporate form— are penalized for engaging in the same political speech.
When Government seeks to use its full power, including the criminal law, to command where a person may get his or her information or what distrusted source he or she may not hear, it uses censorship to control thought. This is unlawful. The First Amendment confirms the freedom to think for ourselves.
2
What we have said also shows the invalidity of other arguments made by the Government. For the most part relinquishing the antidistortion rationale, the Government falls back on the argument that corporate political speech can be banned in order to prevent corruption or its appearance. In Buckley, the Court found this interest “sufficiently important” to allow limits on contributions but did not extend that reasoning to expenditure limits. 424 U. S., at 25. When Buckley examined an expenditure ban, it found “that the governmental interest in preventing corruption and the appearance of corruption [was] inadequate to justify [the ban] on independent expenditures.” Id., at 45.
With regard to large direct contributions, Buckley reasoned that they could be given “to secure a political quid pro quo,” id., at 26, and that “the scope of such pernicious practices can never be reliably ascertained,” id., at 27. The practices Buckley noted would be covered by bribery laws, see, e. g., 18 U. S. C. § 201, if a quid pro quo arrangement were proved. See Buckley, supra, at 27, and n. 28 (citing Buckley v. Valeo, 519 F. 2d 821, 839-840, and nn. 36-38 *357 (CADC 1975) (en banc) (per curiam)). The Court, in consequence, has noted that restrictions on direct contributions are preventative, because few if any contributions to candidates will involve quid pro quo arrangements. MCFL, 479 U. S., at 260; NCPAC, 470 U. S., at 500; Federal Election Comm’n v. National Right to Work Comm., 459 U. S. 197, 210 (1982) (NRWC). The Buckley Court, nevertheless, sustained limits on direct contributions in order to ensure against the reality or appearance of corruption. That case did not extend this rationale to independent expenditures, and the Court does not do so here.
“The absence of prearrangement and coordination of an expenditure with the candidate or his agent not only undermines the value of the expenditure to the candidate, but also alleviates the danger that expenditures will be given as a quid pro quo for improper commitments from the candidate.” Buckley, 424 U. S., at 47; see ibid, (independent expenditures have a “substantially diminished potential for abuse”). Limits on independent expenditures, such as § 441b, have a chilling effect extending well beyond the Government’s interest in preventing quid pro quo corruption. The anticorruption interest is not sufficient to displace the speech here in question. Indeed, 26 States do not restrict independent expenditures by for-profit corporations. The Government does not claim that these expenditures have corrupted the political process in those States. See Supp. Brief for Appellee 18, n. 3; Supp. Brief for Chamber of Commerce of the United States of America as Amicus Curiae 8-9, n. 5.
A single footnote in Bellotti purported to leave open the possibility that corporate independent expenditures could be shown to cause corruption. 435 U. S., at 788, n. 26. For the reasons explained above, we now conclude that independent expenditures, including those made by corporations, do not give rise to corruption or the appearance of corruption. Dicta in Bellotti’s footnote suggested that “a corporation’s right to speak on issues of general public interest implies no *358 comparable right in the quite different context of participation in a political campaign for election to public office.” Ibid. Citing the portion of Buckley that invalidated the federal independent expenditure ban, 424 U. S., at 46, and a law review student comment, Bellotti surmised that “Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections.” 435 U. S., at 788, n. 26. Buckley, however, struck down a ban on independent expenditures to support candidates that covered corporations, 424 U. S., at 23, 39, n. 45, and explained that “the distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application,” id., at 42. Bellotti’s dictum is thus supported only by a law review student comment, which misinterpreted Buckley. See Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U. Pa. L. Rev. 386, 408 (1977) (suggesting that “corporations and labor unions should be held to different and more stringent standards than an individual or other associations under a regulatory scheme for campaign financing”).
Seizing on this aside in Bellotti’s footnote, the Court in NRWC did say there is a “sufficient” governmental interest in “ensuring] that substantial aggregations of wealth amassed” by corporations would not “be used to incur political debts from legislators who are aided by the contributions.” 459 U. S., at 207-208 (citing Automobile Workers, 352 U. S., at 579); see 459 U. S., at 210, and n. 7; NCPAC, supra, at 500-501 (NRWC suggested a governmental interest in restricting “the influence of political war chests funneled through the corporate form”). NRWC, however, has little relevance here. NRWC decided no more than that a restriction on a corporation’s ability to solicit funds for its segregated PAC, which made direct contributions to candidates, did not violate the First Amendment. 459 U. S., at *359 206. NRWC thus involved contribution limits, see NCPAC, supra, at 495-496, which, unlike limits on independent expenditures, have been an accepted means to prevent quid pro quo corruption, see McConnell, 540 U. S., at 136-138, and n. 40; MCFL, supra, at 259-260. Citizens United has not made direct contributions to candidates, and it has not suggested that the Court should reconsider whether contribution limits should be subjected to rigorous First Amendment scrutiny.
When Buckley identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to quid pro quo corruption. See McConnell, supra, at 296-298 (opinion of Kennedy, J.) (citing Buckley, supra, at 26-28, 30, 46-48); NCPAC, 470 U. S., at 497 (“The hallmark of corruption is the financial quid pro quo: dollars for political favors”); id., at 498. The fact that speakers may have influence over or access to elected officials does not mean that these officials are corrupt:
“Favoritism and influence are not... avoidable in representative politics. It is in the nature of an elected representative to favor certain policies, and, by necessary corollary, to favor the voters and contributors who support those policies. It is well understood that a substantial and legitimate reason, if not the only reason, to cast a vote for, or to make a contribution to, one candidate over another is that the candidate will respond by producing those political outcomes the supporter favors. Democracy is premised on responsiveness.” McConnell, 540 U. S., at 297 (opinion of Kennedy, J.).
Reliance on a “generic favoritism or influence theory ... is at odds with standard First Amendment analyses because it is unbounded and susceptible to no limiting principle.” Id., at 296.
*360 The appearance of influence or access, furthermore, will not cause the electorate to lose faith in our democracy. By definition, an independent expenditure is political speech presented to the electorate that is not coordinated with a candidate. See Buckley, supra, at 46. The fact that a corporation, or any other speaker, is willing to spend money to try to persuade voters presupposes that the people have the ultimate influence over elected officials. This is inconsistent with any suggestion that the electorate will refuse “ ‘to take part in democratic governance’ ” because of additional political speech made by a corporation or any other speaker. McConnell, supra, at 144 (quoting Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 390 (2000)).
Caperton v. A. T. Massey Coal Co., 556 U. S. 868 (2009), is not to the contrary. Caperton held that a judge was required to recuse himself “when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge’s election campaign when the case was pending or imminent.” Id., at 884. The remedy of recusal was based on a litigant’s due process right to a fair trial before an unbiased judge. See Withrow v. Larkin, 421 U. S. 35, 46 (1975). Caperton’s holding was limited to the rule that the judge must be recused, not that the litigant’s political speech could be banned.
The McConnell record was “over 100,000 pages” long, McConnell I, 251 F. Supp. 2d, at 209, yet it “does not have any direct examples of votes being exchanged for . . . expenditures,” id., at 560 (opinion of Kollar-Kotelly, J.). This confirms Buckley’s reasoning that independent expenditures do not lead to, or create the appearance of, quid pro quo corruption. In fact, there is only scant evidence that independent expenditures even ingratiate. See 251 F. Supp. 2d, at 555-557 (opinion of Kollar-Kotelly, J.). Ingratiation and access, in any event, are not corruption. The BCRA record establishes that certain donations to political parties, called “soft *361 money,” were made to gain access to elected officials. McConnell, supra, at 125, 130-131, 146-152; see McConnell I, 251 F. Supp. 2d, at 471-481, 491-506 (opinion of Kollar-Kotelly, J.); id., at 842-843, 858-859 (opinion of Leon, J.). This case, however, is about independent expenditures, not soft money. When Congress finds that a problem exists, we must give that finding due deference; but Congress may not choose an unconstitutional remedy. If elected officials succumb to improper influences from independent expenditures; if they surrender their best judgment; and if they put expediency before principle, then surely there is cause for concern. We must give weight to attempts by Congress to seek to dispel either the appearance or the reality of these influences. The remedies enacted by law, however, must comply with the First Amendment; and it is our law and our tradition that more speech, not less, is the governing rule. An outright ban on corporate political speech during the critical preelection period is not a permissible remedy Here Congress has created categorical bans on speech that are asymmetrical to preventing quid pro quo corruption.
3
The Government contends further that corporate independent expenditures can be limited because of its interest in protecting dissenting shareholders from being compelled to fund corporate political speech. This asserted interest, like Austin’s antidistortion rationale, would allow the Government to ban the political speech even of media corporations. See supra, at 352-354. Assume, for example, that a shareholder of a corporation that owns a newspaper disagrees with the political views the newspaper expresses. See Austin, 494 U. S., at 687 (Scalia, J., dissenting). Under the Government’s view, that potential disagreement could give the Government the authority to restrict the media corporation’s political speech. The First Amendment does not allow that power. There is, furthermore, little evidence of *362 abuse that cannot be corrected by shareholders “through the procedures of corporate democracy.” Bellotti, 435 U. S., at 794; see ibid., n. 34.
Those reasons are sufficient to reject this shareholder-protection interest; and, moreover, the statute is both under-inclusive and overinclusive. As to the first, if Congress had been seeking to protect dissenting shareholders, it would not have banned corporate speech in only certain media within 30 or 60 days before an election. A dissenting shareholder’s interests would be implicated by speech in any media at any time. As to the second, the statute is overinclusive because it covers all corporations, including nonprofit corporations and for-profit corporations with only single shareholders. As to other corporations, the remedy is not to restrict speech but to consider and explore other regulatory mechanisms. The regulatory mechanism here, based on speech, contravenes the First Amendment.
4
We need not reach the question whether the Government has a compelling interest in preventing foreign individuals or associations from influencing our Nation’s political process. Cf. 2 U. S. C. §441e (contribution and expenditure ban applied to “foreign nationals]”). Section 441b is not limited to corporations or associations that were created in foreign countries or funded predominantly by foreign shareholders. Section 441b therefore would be overbroad even if we assumed, arguendo, that the Government has a compelling interest in limiting foreign influence over our political process. See Broadrick, 413 U. S., at 615.
C
Our precedent is to be respected unless the most convincing of reasons demonstrates that adherence to it puts us on a course that is sure error. “Beyond workability, the relevant factors in deciding whether to adhere to the principle of stare *363 decisis include the antiquity of the precedent, the reliance interests at stake, and of course whether the decision was well reasoned.” Montejo v. Louisiana, 556 U. S. 778, 792-793 (2009) (overruling Michigan v. Jackson, 475 U. S. 625 (1986)). We have also examined whether “experience has pointed up the precedent’s shortcomings.” Pearson v. Callahan, 555 U. S. 223, 233 (2009) (overruling Saucier v. Katz, 533 U. S. 194 (2001)).
These considerations counsel in favor of rejecting Austin, which itself contravened this Court’s earlier precedents in Buckley and Bellotti. “This Court has not hesitated to overrule decisions offensive to the First Amendment.” WRTL, 551 U. S., at 500 (opinion of Scalia, J.). “[S]tare decisis is a principle of policy and not a mechanical formula of adherence to the latest decision.” Helvering v. Hallock, 309 U. S. 106, 119 (1940).
For the reasons above, it must be concluded that Austin was not well reasoned. The Government defends Austin, relying almost entirely on “the quid pro quo interest, the corruption interest or the shareholder interest,” and not Austin’s expressed antidistortion rationale. Tr. of Oral Arg. 48 (Sept. 9, 2009); see id., at 45-46. When neither party defends the reasoning of a precedent, the principle of adhering to that precedent through stare decisis is diminished. Austin abandoned First Amendment principles, furthermore, by relying on language in some of our precedents that traces back to the Automobile Workers Court’s flawed historical account of campaign finance laws, see Brief for Campaign Finance Scholars as Amici Curiae; Hayward, 45 Harv. J. Legis. 421; R. Mutch, Campaigns, Congress, and Courts 33-35, 153-157 (1988). See Austin, supra, at 659 (citing MCFL, 479 U. S., at 257-258; NCPAC, 470 U. S., at 500-501); MCFL, supra, at 257 (citing Automobile Workers, 352 U. S., at 585); NCPAC, supra, at 500 (citing NRWC, 459 U. S., at 210); id., at 208 (“The history of the movement to regulate the political contributions and expenditures of corporations *364 and labor unions is set forth in great detail in [Automobile Workers], supra, at 570-584, and we need only summarize the development here”).
Austin is undermined by experience since its announcement. Political speech is so ingrained in our culture that speakers find ways to circumvent campaign finance laws. See, e. g., McConnell, 540 U. S., at 176-177 (“Given BCRA’s tighter restrictions on the raising and spending of soft money, the incentives ... to exploit [26 U. S. C. § 527] organizations will only increase”). Our Nation’s speech dynamic is changing, and informative voices should not have to circumvent onerous restrictions to exercise their First Amendment rights. Speakers have become adept at presenting citizens with sound bites, talking points, and scripted messages that dominate the 24-hour news cycle. Corporations, like individuals, do not have monolithic views. On certain topics corporations may possess valuable expertise, leaving them the best equipped to point out errors or fallacies in speech of all sorts, including the speech of candidates and elected officials.
Rapid changes in technology — and the. creative dynamic inherent in the concept of free expression — counsel against upholding a law that restricts political speech in certain media or by certain speakers. See Part II-C, supra. Today, 30-second television ads may be the most effective way to convey a political message. See McConnell, supra, at 261 (opinion of SCALIA, J.). Soon, however, it may be that Internet sources, such as blogs and social networking Web sites, will provide citizens with significant information about political candidates and issues. Yet, §441b would seem to ban a blog post expressly advocating the election or defeat of a candidate if that blog were created with corporate funds. See 2 U. S. C. §441b(a); MCFL, supra, at 249. The First Amendment does not permit Congress to make these categorical distinctions based on the corporate identity of the speaker and the content of the political speech.
*365 No serious reliance interests are at stake. As the Court stated in Payne v. Tennessee, 501 U. S. 808, 828 (1991), reliance interests are important considerations in property and contract cases, where parties may have acted in conformance with existing legal rules in order to conduct transactions. Here, though, parties, have been prevented from acting— corporations have been banned from making independent expenditures. Legislatures may have enacted bans on corporate expenditures believing that those bans were constitutional. This is not a compelling interest for stare decisis. If it were, legislative acts could prevent us from overruling our own precedents, thereby interfering with our duty “to say what the law is.” Marbury v. Madison, 1 Cranch 137, 177 (1803).
Due consideration leads to this conclusion: Austin, 494 U. S. 652, should be and now is overruled. We return to the principle established in Buckley and Bellotti that the Government may not suppress political speech on the basis of the speaker’s corporate identity. No sufficient governmental interest justifies limits on the political speech of nonprofit or for-profit corporations.
D
Austin is overruled, so it provides no basis for allowing the Government to limit corporate independent expenditures. As the Government appears to concede, overruling Austin “effectively invalidate[s] not only BCRA Section 203, but also 2 U. S. C. 441b’s prohibition on the use of corporate treasury funds for express advocacy.” Brief for Appellee 33, n. 12. Section 441b’s restrictions on corporate independent expenditures are therefore invalid and cannot be applied to Hillary.
Given our conclusion we are further required to overrule the part of McConnell that upheld BCRA §203’s extension of §441b’s restrictions on corporate independent expenditures. See 540 U. S., at 203-209. The McConnell Court relied on *366 the antidistortion interest recognized in Austin to uphold a greater restriction on speech than the restriction upheld in Austin, see 540 U. S., at 205, and we have found this interest unconvincing and insufficient. This part of McConnell is now overruled.
IV
A
Citizens United next challenges BCRA’s disclaimer and disclosure provisions as applied to Hillary and the three advertisements for the movie. Under BCRA §311, televised electioneering communications funded by anyone other than a candidate must include a disclaimer that “‘-is responsible for the content of this advertising.’ ” 2 U. S. C. §441d(d)(2). The required statement must be made in a “clearly spoken manner,” and displayed on the screen in a “clearly readable manner” for at least four seconds. Ibid. It must state that the communication “is not authorized by any candidate or candidate’s committee”; it must also display the name and address (or Web site address) of the person or group that funded the advertisement. § 441d(a)(3). Under BCRA §201, any person who spends more than $10,000 on electioneering communications within a calendar year must file a disclosure statement with the FEC. 2 U. S. C. § 434(f)(1). That statement must identify the person making the expenditure, the amount of the expenditure, the election to which the communication was directed, and the names of certain contributors. § 434(f)(2).
Disclaimer and disclosure requirements may burden the ability to speak, but they “impose no ceiling on campaign-related activities,” Buckley, 424 U. S., at 64, and “do not prevent anyone from speaking,” McConnell, supra, at 201 (internal quotation marks and brackets omitted). The Court has subjected these requirements to “exacting scrutiny,” which requires a “substantial relation” between the disclosure requirement and a “sufficiently important” governmen *367 tal interest. Buckley, supra, at 64, 66 (internal quotation marks omitted); see McConnell, supra, at 231-232.
In Buckley, the Court explained that disclosure could be justified based on a governmental interest in “provid[ing] the electorate with information” about the sources of election-related spending. 424 U. S., at 66. The McConnell Court applied this interest in rejecting facial challenges to BCRA §§201 and 311. 540 U. S., at 196. There was evidence in the record that independent groups were running election-related advertisements “'while hiding behind dubious and misleading names.’” Id., at 197 (quoting McConnell I, 251 F. Supp. 2d, at 237). The Court therefore upheld BCRA §§201 and 311 on the ground that they would help citizens “ 'make informed choices in the political marketplace.’ ” 540 U. S., at 197 (quoting McConnell I, supra, at 237); see 540 U. S., at 231.
Although both provisions were facially upheld, the Court acknowledged that as-applied challenges would be available if a group could show a “ 'reasonable probability’ ” that disclosure of its contributors’ names “ 'will subject them to threats, harassment, or reprisals from either Government officials or private parties.’” Id., at 198 (quoting Buckley, supra, at 74).
For the reasons stated below, we find the statute valid as applied to the ads for the movie and to the movie itself.
B
Citizens United sought to broadcast one 30-second and two 10-second ads to promote Hillary. Under FEC regulations, a communication that “[p]roposes a commercial transaction” was not subject to 2 U. S. C. §441b’s restrictions on corporate or union funding of electioneering communications. 11 CFR §114.15(b)(3)(ii). The regulations, however, do not exempt those communications from the disclaimer and disclosure requirements in BCRA §§201 and 311. See 72 Fed. Reg. 72901 (2007).
*368 Citizens United argues that the disclaimer requirements in §311 are unconstitutional as applied to its ads. It contends that the governmental interest in providing information to the electorate does not justify requiring disclaimers for any commercial advertisements, including the ones at issue here. We disagree. The ads fall within BCRA’s definition of an “electioneering communication”: They referred to then-Senator Clinton by name shortly before a primary and contained pejorative references to her candidacy. See 530 F. Supp. 2d, at 276, nn. 2-4. The disclaimers required by §311 “provid[e] the electorate with information,” McConnell, supra, at 196, and “insure that the voters are fully informed” about the person or group who is speaking, Buckley, supra, at 76; see also Bellotti, 435 U. S., at 792, n. 32 (“Identification of the source of advertising may be required as a means of disclosure, so that the people will be able to evaluate the arguments to which they are being subjected”). At the very least, the disclaimers avoid confusion by making clear that the ads are not funded by a candidate or political party.
Citizens United argues that §311 is underinclusive because it requires disclaimers for broadcast advertisements but not for print or Internet advertising. It asserts that §311 decreases both the quantity and effectiveness of the group's speech by forcing it to devote four seconds of each advertisement to the spoken disclaimer. We rejected these arguments in McConnell, supra, at 230-231. And we now adhere to that decision as it pertains to the disclosure provisions.
As a final point, Citizens United claims that, in any event, the disclosure requirements in §201 must be confined to speech that is the functional equivalent of express advocacy. The principal opinion in WRTL limited 2 U. S. C. § 441b’s restrictions on independent expenditures to express advocacy and its functional equivalent. 551 U. S., at 469-476 (opinion of Roberts, C. J.). Citizens United seeks to import a simi *369 lar distinction into BCRA’s disclosure requirements. We reject this contention.
The Court has explained that disclosure is a less restrictive alternative to more comprehensive regulations of speech. See, e. g., MCFL, 479 U. S., at 262. In Buckley, the Court upheld a disclosure requirement for independent expenditures even though it invalidated a provision that imposed a ceiling on those expenditures. 424 U. S., at 75-76. In McConnell, three Justices who would have found §441b to be unconstitutional nonetheless voted to uphold BCRA’s disclosure and disclaimer requirements. 540 U. S., at 321 (opinion of Kennedy, J., joined by Rehnquist, C. J, and Scalia, J.). And the Court has upheld registration and disclosure requirements on lobbyists, even though Congress has no power to ban lobbying itself. United States v. Harriss, 347 U. S. 612, 625 (1954) (Congress “has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend funds for that purpose”). For these reasons, we reject Citizens United’s contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy.
Citizens United also disputes that an informational interest justifies the application of §201 to its ads, which only attempt to persuade viewers to see the film. Even if it disclosed the funding sources for the ads, Citizens United says, the information would not help viewers make informed choices in the political marketplace. This is similar to the argument rejected above with respect to disclaimers. Even if the ads only pertain to a commercial transaction, the public has an interest in knowing who is speaking about a candidate shortly before an election. Because the informational interest alone is sufficient to justify application of §201 to these ads, it is not necessary to consider the Government’s other asserted interests.
*370 Last, Citizens United argues that disclosure requirements can chill donations to an organization by exposing donors to retaliation. Some amici point to recent events in which donors to certain causes were blacklisted, threatened, or otherwise targeted for retaliation. See Brief for Institute for Justice as Amicus Curiae, 13-16; Brief for Alliance Defense Fund as Amicus Curiae 16-22. In McConnell, the Court recognized that § 201 would be unconstitutional as applied to an organization if there were a reasonable probability that the group’s members would face threats, harassment, or reprisals if their names were disclosed. 540 U. S., at 198. The examples cited by amici are cause for concern. Citizens United, however, has offered no evidence that its members may faee similar threats or reprisals. To the contrary, Citizens United has been disclosing its donors for years and has identified no instance of harassment or retaliation.
Shareholder objections raised through the procedures of corporate democracy, see Bellotti, supra, at 794, and n. 34, can be more effective today because modern technology makes disclosures rapid and informative. A campaign finance system that pairs corporate independent expenditures with effective disclosure has not existed before today. It must be noted, furthermore, that many of Congress’ findings in passing BCRA were premised on a system without adequate disclosure. See McConnell, 540 U. S., at 128 (“[T]he public may not have been fully informed about the sponsorship of so-called issue ads”); id., at 196-197 (citing McConnell I, 251 F. Supp. 2d, at 237). With the advent of the Internet, prompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. Shareholders can determine whether their corporation’s political speech advances the corporation’s interest in making profits, and citizens can see whether elected officials are “‘in the pocket’ of so-called moneyed interests.” 540 U. S., at 259 (opinion of Scalia, J.); see MCFL, supra, at *371 261. The First Amendment protects political speech; and disclosure permits citizens and shareholders to react to the speech of corporate entities in a proper way. This transparency enables the electorate to make informed decisions and give proper weight to different speakers and messages.
C
For the same reasons we uphold the application of BCRA §§201 and 311 to the ads, we affirm their application to Hillary. We find no constitutional impediment to the application of BCRA’s disclaimer and disclosure requirements to a movie broadcast via video-on-demand. And there has been no showing that, as applied in this case, these requirements would impose a chill on speech or expression.
V
When word concerning the plot of the movie Mr. Smith Goes to Washington reached the circles of Government, some officials sought, by persuasion, to discourage its distribution. See Smoodin, “Compulsory” Viewing for Every Citizen: Mr. Smith and the Rhetoric of Reception, 35 Cinema Journal 3, 19, and n. 52 (Winter 1996) (citing Mr. Smith Riles Washington, Time, Oct. 30, 1939, p. 49); Nugent, Capra’s Capitol Offense, N. Y. Times, Oct. 29, 1939, p. X5. Under Austin, though, officials could have done more than discourage its distribution — they could have banned the film. After all, it, like Hillary, was speech funded by a corporation that was critical of Members of Congress. Mr. Smith Goes to Washington may be fiction and caricature; but fiction and caricature can be a powerful force.
Modern day movies, television comedies, or skits on YouTube.com might portray public officials or public policies in unflattering ways. Yet if a covered transmission during the blackout period creates the background for candidate endorsement or opposition, a felony occurs solely because a corporation, other than an exempt media corporation, has made *372 the “purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value” in order to engage in political speech. 2 U. S. C. § 431(9)(A)(i). Speech would be suppressed in the realm where its necessity is most evident: in the public dialogue preceding a real election. Governments are often hostile to speech, but under our law and our tradition it seems stranger than fiction for our Government to make this political speech a crime. Yet this is the statute’s purpose and design.
Some members of the public might consider Hillary to be insightful and instructive; some might find it to be neither high art nor a fair discussion on how to set the Nation’s course; still others simply might suspend judgment on these points but decide to think more about issues and candidates. Those choices and assessments, however, are not for the Government to make. “The First Amendment underwrites the freedom to experiment and to create in the realm of thought and speech. Citizens must be free to use new forms, and new forums, for the expression of ideas. The civic discourse belongs to the people, and the Government may not prescribe the means used to conduct it.” McConnell, supra, at 341 (opinion of Kennedy, J.).
The judgment of the District Court is reversed with respect to the constitutionality of 2 U. S. C. § 441b’s restrictions on corporate independent expenditures. The judgment is affirmed with respect to BCRA’s disclaimer and disclosure requirements. The case is remanded for further proceedings consistent with this opinion.

It is so ordered.