2013 VT 87

## State of Vermont v. Green Mountain Future

[86 A.3d 981]

No. 12-072

Present: **Reiber, C.J., Dooley, Skoglund and Burgess, JJ., and Cohen, Supr. J., Specially Assigned**

Opinion Filed September 27, 2013

*William H. Sorrell*, Attorney General, and *Eve Jacobs-Carnahan* and *Megan J. Shafritz*, Assistant Attorneys General, Montpelier, for Plaintiff-Appellee/Cross-Appellant.

*Joshua R. Diamond* of *Diamond & Robinson, P.C.*, Montpelier, and *James Lamb* of *Sandler, Reiff, Young & Lamb*, Washington, DC, for Defendant-Appellant/Cross-Appellee.

¶ 1. **Dooley, J.** Appellant Green Mountain Future (GMF) appeals the summary judgment decision of the trial court finding that it is a political action committee (PAC) and violated a number of provisions of the Vermont campaign finance laws. GMF maintains that the trial court erred in not applying a narrowing construction created by the U.S. Supreme Court in the 1976 case of *Buckley v. Valeo*, 424 U.S. 1 (1976), to the definition of a PAC under Vermont campaign finance laws, and that without that construction the registration and disclosure laws are unconstitutional under the overbreadth doctrine of the First Amendment and the vagueness doctrine of the Fourteenth Amendment. The State cross-appeals the $10,000 civil penalty assigned by the trial court, asserting that that court abused its discretion by misapplying certain factors and imposing a penalty for only one of GMF's violations. We affirm the trial court's decision on summary judgment and the civil penalty, except that we remand for reconsideration of the penalty for the violation of the identification requirement.

¶ 2. This case largely turns on the scope and continuing vitality of the "magic words" that GMF argues are required by *Buckley v. Valeo*. See *infra*, ¶¶ 25-27. GMF argues that its advertisements were purely issue advocacy and did not seek to affect the outcome of an election, in this case for Governor of Vermont. The State argues that GMF's advertisements were transparently employed to defeat the candidacy of Brian Dubie for Governor — indeed, they could have no other purpose — although they did not state so explicitly. We hold that the "magic words" are not required to make the applicable campaign finance statute constitutional.

¶ 3. GMF is an issue advocacy organization registered with the Internal Revenue Service pursuant to 26 U.S.C. § 527 with an address in Barre, Vermont. Its stated purpose is "to communicate with the citizens of Vermont about economic, environmental, and other issues of importance without expressly advocating the election or defeat of any candidate." In September 2010, the month that it was established, it reported contributions of $533,955 and expenditures of $429,186. The contributions were almost exclusively from the Democratic Governors Association, and

the expenditures went mainly towards two television advertisements that were aired a total of over 4000 times in September and October 2010. Both advertisements focused on the Republican candidate for Governor, and then-Lieutenant ·Governor, Brian Dubie and his support for the continued operation of the Vermont Yankee Nuclear Power Station. They included his photograph and concluded with the statements, "Vermont Yankee open another twenty years would be a disaster. Tell Brian Dubie he's wrong about Vermont Yankee," and "Want Vermont Yankee open another twenty years? Tell Brian Dubie no." They were strongly negative in tone, but did not mention the upcoming election for Governor nor Brian Dubie's candidacy and did not urge voters to vote for a particular candidate in that election.

¶ 4. 17 V.S.A. § 2801(4) defines a "political committee" or "political action committee" (PAC) as an:

> entity . . . which receives contributions of more than $500.00 and makes expenditures of more than $500.00 in any one calendar year for the purpose of supporting or opposing one or more candidates, influencing an election, or advocating a position on a public question,[1] in any election or affecting the outcome of an election.[2]

¶ 5. If an organization is a PAC under this definition, it is then subject to 17 V.S.A. § 2831 (the "registration requirement"), which requires any PAC or party spending more than $500 to register

---

[1] A "public question" is an "issue that is before the voters for a binding decision." 17 V.S.A. § 2801(8). No public question advocacy is involved in this case.

[2] The purposes contained in the definition of "expenditure," 17 V.S.A. § 2801(3), are similar (albeit in a slightly different order) to those in the reference to "expenditures" in the definition of a PAC: "a payment, disbursement, distribution, advance, deposit, loan, or gift of money or anything of value . . . for the purpose of influencing an election, advocating a position on a public question, or supporting or opposing one or more candidates." 17 V.S.A. § 2801(3). Unlike the § 2801(4) definition of a PAC, however, the definition of "expenditure" does not contain the ending phrase "in any election or affecting the outcome of any election." We have never construed this phrase or commented on its significance. GMF has not relied upon this phrase in its overbreadth or vagueness challenges, focusing instead on the phrase "influencing an election." Therefore, we do not consider the effect of this phrase on our analysis in the remainder of this opinion. With this exception, this opinion follows the trial court decision in focusing on the definition of a PAC in § 2801(4), but that analysis is of course applicable to § 2801(3) as well, insofar as the language connected to "expenditure" in § 2801(4) is largely a repetition of the content of § 2801(3).

with the Secretary of State within 10 days of having reached the $500 threshold for expenditures, and to 17 V.S.A. § 2811 (the "disclosure requirement"), which requires it to file campaign finance reports on specified dates.

¶ 6. The other statutory provision in question is 17 V.S.A. § 2892 (the "identification requirement"). This provision is not limited to any particular type of group, and provides:

> All electioneering communications shall contain the name and address of the person, political committee, or campaign who or which paid for the communication. The communication shall clearly designate the name of the candidate, party, or political committee by or on whose behalf the same is published or broadcast.

¶ 7. "Electioneering communication" is defined at § 2891 as:

> [A]ny communication, including communications published in any newspaper or periodical or broadcast on radio or television or over any public address system, placed on any billboards, outdoor facilities, buttons, or printed material . . . that refers to a clearly identified candidate for office and that promotes or supports a candidate for that office, or attacks or opposes a candidate for that office, regardless of whether the communication expressly advocates a vote for or against a candidate.

¶ 8. The State filed an action in the trial court requesting a declaration that GMF was in violation of Vermont election laws for: (1) failing to register with the state as a PAC in violation of the registration requirement, 17 V.S.A. § 2831; (2) failing to file reports in violation of the disclosure requirement for PACs, *id.* § 2811; and (3) failing to include its address in the two television advertisements in violation of the identification requirement, *id.* § 2892. The State claimed that GMF was subject to the disclosure and registration requirements because it had received and expended more than $500 in the calendar year "for the purpose of supporting or opposing one or more candidates, or influencing an election."

¶ 9. GMF responded that, because its advertisements were pure issue advocacy ads related to nuclear policy, they constituted neither expenditures that triggered PAC status and the registration and disclosure requirements, nor "electioneering communica-

tions" that triggered the identification requirement. GMF further argued that putting its website address on the advertisements satisfied the identification requirement. It also counterclaimed, under 42 U.S.C. § 1983, making two constitutional arguments: (1) that the First Amendment prohibits state regulation of issue advocacy, and (2) that the registration requirement, its accompanying disclosure requirement, and the disclaimer requirement are unconstitutional because they are vague and overly broad, therefore violating the First Amendment and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The two parties filed cross-motions for summary judgment.

¶ 10. The trial court rejected GMF's constitutional arguments and found that GMF violated the registration, disclosure, and identification requirements. The court specifically found that GMF's advertisements were electioneering communications because "[t]hey refer to a clearly identified candidate for office" and "oppose [his] fitness for office by raising questions about his judgment and policy choices." In so doing, the court adopted a narrowing construction of the PAC definition in order to avoid both vagueness and overbreadth concerns for the registration and disclosure requirements, finding that PAC status is triggered with respect to a candidate election by an expenditure "for the purpose of supporting or opposing one or more candidates."

¶ 11. In reaching its decision, the trial court concluded "[i]t would require the cheerful credulity of a very young child to conclude that the two political advertisements, prominently featuring Lt. Governor Dubie's name and photograph and aired just prior to the gubernatorial election, had neither the intention nor the effect of advocating against his election." Thus, it drew the "obvious inference from the undisputed facts that the advertisements, objectively viewed, were created and broadcast for the purpose of opposing a candidate." It held that GMF violated the statutes imposing the registration, disclosure and identification requirements. GMF disputes these conclusions only by arguing that the statutes must be narrowed to be constitutional and, as narrowed, that the statutes do not extend to GMF's conduct.

¶ 12. Following the summary judgment decision, the State sought a $100,000 civil penalty from GMF. The trial court declined to impose such a large penalty, but instead levied on GMF a civil penalty of $10,000 for the violation of the registration requirement, finding that to be the "most critical violation" of the

campaign finance laws. It declined to give a separate penalty for the violation of the disclosure requirement. Its decision on the civil penalty does not reference the violation of the identification requirement, although it does seem perhaps to be referring to that violation when it states: "The potential number of individual violations is astronomical since the television advertisements were aired thousands of times."

¶ 13. On appeal, GMF argues that the trial court erred in its construction of the statutory definition of a PAC when it did not employ the "express advocacy" construction of the federal statute from *Buckley* in order to avoid vagueness and overbreadth, but instead created its own narrowing construction of the definition. Under the *Buckley* construction, GMF argues, its advertisements did not trigger PAC status because they did not "include any words expressly advocating any electoral action," or in fact "include *any* references to an election, voting, campaigns, or identify that any person in the communications was a candidate for elected office," and GMF therefore did not violate either the registration or the disclosure requirement. If the limiting construction of *Buckley* is not employed, GMF argues, "[a]ny broader interpretation would be rendered unconstitutional for vagueness and overbreadth." GMF does not appeal the finding of the violation of the identification requirement, presumably because it was not given a penalty for that finding.[3] For its part, the State appeals the $10,000 civil penalty, arguing that that court abused its discretion by misapplying certain factors and giving a penalty for only one of the violations. Further, it argues that the trial court abused its discretion in failing to consider the violation of the identification requirement in assigning the penalty.

¶ 14. This case comes to us from a summary judgment order. We review a summary judgment order using the same standard as the trial court. *Richart v. Jackson*, 171 Vt. 94, 97, 758 A.2d 319, 321 (2000). Summary judgment is appropriate when, taking all allegations made by the nonmoving party as true, there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. V.R.C.P. 56(a); *Richart*, 171 Vt. at 97, 758 A.2d at 321.

---

[3] We have nevertheless addressed this ruling because it is related to the lower court decision with respect to the PAC definition.

¶ 15. We review the trial court's conclusions of law, particularly its constitutional decisions, de novo. See *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 476 (7th Cir. 2012).

¶ 16. We review the trial court's imposition of a civil penalty under an abuse of discretion standard. *State v. Irving Oil Corp.*, 2008 VT 42, ¶ 18, 183 Vt. 386, 955 A.2d 1098. Abuse of discretion will be found where "the court either failed to exercise its discretion altogether or exercised it for reasons that are clearly untenable or unreasonable." *Herald Ass'n v. Dean*, 174 Vt. 350, 359-60, 816 A.2d 469, 477-78 (2002).

¶ 17. ■ We begin with the appeal of the trial court's decision on summary judgment, and GMF's constitutional arguments regarding vagueness and overbreadth. Although we follow the general policy of *Buckley*, as currently understood in more recent U.S. Supreme Court decisions, we conclude that the "magic words" need not be required in a communication in order to uphold a registration, disclosure or identification requirement of the type contained in the relevant Vermont statutes against either a vagueness or overbreadth challenge. We engage generally in a constitutional analysis of the registration, disclosure and identification requirements and find them constitutional, adopting a narrowing construction of 17 V.S.A. § 2801(4) that is slightly more broad than that used by the trial court. Re-examining GMF's activities after determining that the registration and disclosure requirements of 17 V.S.A. §§ 2811 and 2831 are constitutional, we find that GMF violated those statutes. Next, we address the State's cross-appeal regarding the civil penalty. Finally, we briefly address a motion made in this Court regarding the documents GMF included in its printed case.

¶ 18. ■ GMF challenges the registration and disclosure provisions under both the overbreadth and vagueness doctrines. These two doctrines are not the same: the overbreadth doctrine of the First Amendment asks "whether the statute in question is so broad that it may not only prohibit unprotected behavior but may also prohibit constitutionally protected activity as well." *Blondheim v. State*, 529 P.2d 1096, 1100 (Wash. 1975) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972)). The vagueness doctrine of the Due Process Clause of the Fifth or Fourteenth Amendment, on the other hand, asks "whether a statute provides fair notice . . . of that conduct which is prohibited

and whether there are proper standards for adjudication." *Id.* (citing *Grayned*, 408 U.S. at 108). However, courts "have traditionally viewed vagueness and overbreadth as logically related and similar doctrines," *Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983), and that is even more true in campaign finance cases and First Amendment cases more generally. Beginning with *Buckley v. Valeo* in 1976, the U.S. Supreme Court's vagueness jurisprudence surrounding campaign finance has involved overbreadth concepts as well, the idea being that a statute must be clear enough (vagueness) so as not to extend to protected speech (overbreadth). See 424 U.S. at 41.

¶ 19. It is thus unsurprising that GMF's constitutional argument mixes the two concepts. First, we look at *Buckley* to understand the relationship between the two doctrines. Next, we address each doctrine in turn.

¶ 20. In *Buckley*, the U.S. Supreme Court addressed challenges to a number of provisions of the federal campaign finance law in force at that time, including 18 U.S.C. § 434(e).[4] 424 U.S. at 75-82. That provision required "[e]very person (other than a political committee or candidate) who makes contributions or expenditures [of over $100 in a calendar year]" to file statements with the Federal Election Commission on certain dates. "Contribution" and "expenditure" were defined in 18 U.S.C. § 431(e) and (f), respectively. The definition of "expenditure," 18 U.S.C. § 431(f), was a "purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value," made "for the purpose of influencing . . . [an] election." *Buckley*, 424 U.S. at 147.

¶ 21. In order to avoid what the Court termed "serious problems of vagueness," 424 U.S. at 76, it adopted a narrowing construction of the phrase "for the purpose of influencing an election," under which an "expenditure" had to take the form of "funds used for communications that expressly advocate the election or defeat of a clearly identified candidate" in order to trigger regulation. *Id.* at 80. Elsewhere in the decision, in a footnote to a different section that also applied a narrowing construction limiting the statute's requirements to communications containing "express terms advocat[ing] the election or defeat of a clearly identified candidate," the Court gave examples of words or

---

[4] The text of the campaign finance law at the time can be found in the appendix to *Buckley*, 424 U.S. at 144 et seq.

phrases that would qualify as express advocacy. *Id.* at 44 n.52. These examples have come to be known as *Buckley*'s "magic · words," intended to distinguish express (campaign) advocacy from issue advocacy. *McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 103 (2003).

¶ 22. Although this narrowing construction was made specifically to avoid the "vagueness problems" of 18 U.S.C. § 434(e), the Court declared that it was construing "expenditure" "for the purposes of that section," which presumably meant all of § 434. *Buckley*, 424 U.S. at 80. This was important because § 434(a)-(c) set out the disclosure requirements for political committees. The Court noted that those disclosure requirements could "raise similar vagueness problems" because "political committee" in § 431(d) was "defined only in terms of amount of annual 'contributions' and 'expenditures,' " suggesting that the narrowing construction was intended to apply also to the "expenditures" that triggered "political committee" status and the consequent registration requirement with the FEC under § 433.[5] *Buckley*, 424 U.S. at 79.

¶ 23. A crucial point to understand about *Buckley* is that it contains two relevant holdings — about overbreadth and vagueness — each of which has evolved over time. One, concerning overbreadth, is that the government can regulate express campaign advocacy in ways that it cannot regulate issue advocacy. The difference between the two types of advocacy particularly relates to disclosure requirements that may intrude on associational privacy when applied to issue advocacy. Because the statute involved in *Buckley* did not make a distinction between the two types of advocacy, the Court found it to be overbroad, although it did not use that term. *Id.* at 79-80 (explaining that the phrase "for the purpose of influencing an election" was suspect because it had the "potential for encompassing both issue discussion and advo-

---

[5] In the same section, the Court approved a separate narrowing construction of "political committee," § 431(d), whereby such a group must also be "under the control of a candidate or the major purpose of which is the nomination or election of a candidate." *Buckley*, 424 U.S. at 79. This has come to be known as the "major purpose" test. However, it has been interpreted by lower courts as only a construction of "political committee" under federal law, not as a constitutional requirement for state definitions of political committees. See *Nat'l Org. for Marriage v. McKee*, 649 F.3d 34, 59 (1st Cir. 2011) ("We find no reason to believe that this so-called 'major purpose' test . . . is anything more than an artifact of the Court's construction of a federal statute."), *cert. denied*, ___ U.S. ___, 132 S. Ct. 1635 (2012); *Yamada v. Weaver*, 872 F. Supp. 2d 1023, 1044 (D. Haw. 2012).

cacy of a political result," and announcing a narrowing construction "[t]o insure that the reach of § 434(e) is not impermissibly broad"). Cases have clarified since that this holding was about overbreadth. See *Osborne v. Ohio*, 495 U.S. 103, 120 n.14 (1990) (stating that *Buckley* was a "landmark case where a law was construed to avoid potential overbreadth problems"); *Fed. Election Comm'n v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 248 (1986) (describing the narrowing construction of *Buckley* as made "in order to avoid problems of overbreadth"); *Nat'l Org. for Marriage v. McKee*, 649 F.3d at 53 (collecting cases) ("[T]here are hints in *Buckley* that the constitutional basis for the Court's concern lay more in overbreadth [than in vagueness] — i.e., that statutes that reached issue discussion might be deemed to regulate impermissibly a substantial amount of speech protected by the First Amendment.").

¶ 24. The second holding of *Buckley* is that, without a specific narrowing construction, the statute involved is vague because the constitutional line between issue advocacy and election advocacy is by itself too difficult to predict in light of the statutory language. See *Buckley*, 424 U.S. at 42 ("[T]he distinction between discussion of issues and candidates and advocacy of election or defeat of candidates may often dissolve in practical application."). Relying on the discussion in *Thomas v. Collins*, 323 U.S. 516 (1945), the Court noted that the distinction puts the speaker at the mercy of the varied understanding of the audience and, therefore " 'offers no security for free discussion.' " *Buckley*, 424 U.S. at 43 (quoting *Thomas*, 323 U.S. at 535). Thus, the Court observed the phrase "for the purpose of influencing an election" has the "potential for encompassing both issue discussion and advocacy of a political result," *id.* at 79.

¶ 25. This holding led the Court to narrow the application of the statute to avoid the constitutional deficiency. *Id.* at 79-82. In turn, the narrowing construction led to the "magic words"; that is, the Court deemed the presence of certain words — like "elect" — to be prerequisite for triggering regulation. See *id.* at 80, 44 n.52. The Court reasoned that such words are express words of election advocacy and show that the communicator is not engaged in issue advocacy alone. See *id.*

¶ 26. In applying *Buckley* to the case at hand, GMF refers to *Buckley*'s "express advocacy" requirement as a necessary construction to avoid both vagueness and overbreadth concerns, and

argues that because the definition of an expenditure triggering PAC status under the Vermont statute also includes the phrase "for the purpose of influencing an election," it must be construed in the same way that the phrase was construed in *Buckley*. Thus, under such a construction, GMF argues that none of the requirements in issue — registration, disclosure or identification — can apply to GMF because its communication did not use any of *Buckley*'s magic words.

¶ 27. ▉ If *Buckley* were the only source of law governing this case, we might find GMF's analysis persuasive. However, as noted above, *Buckley* is merely the beginning of a line of relevant campaign finance decisions — and thus *Buckley*'s holdings have evolved. The constitutional significance of the line between issue advocacy and election advocacy broke down in *McConnell v. Federal Election Commission*, 540 U.S. 93 (2003). In *McConnell*, the U.S. Supreme Court upheld an amendment to the Federal Election Campaign Act (FECA) by the Bipartisan Campaign Reform Act (BCRA) of 2002 that called for disclosure statements in the case of "electioneering communications" not by candidates or political committees. 540 U.S. at 102. An "electioneering communication" was defined as any "broadcast, cable, or satellite communication" that referred to a "clearly identified candidate," was made within a specified amount of time of an election, and (except for references to presidential or vice-presidential candidates) was "targeted to the relevant electorate." *Id.* at 189-90 (quotations omitted). In approving this provision, the Court called the premise that "*Buckley* drew a constitutionally mandated line between express advocacy and so-called issue advocacy, and that speakers possess an inviolable First Amendment right to engage in the latter category of speech" a "misapprehen[sion]" of the Court's prior decisions, and thus "rejected the notion that the First Amendment requires Congress to treat so-called issue advocacy differently from express advocacy." *Id.* at 190, 194. Therefore, because "the important state interests that prompted the *Buckley* Court to uphold FECA's disclosure requirements . . . apply in full to BCRA," "*Buckley* amply supports application of . . . disclosure requirements to the entire range of 'electioneering communications.' " *Id.* at 196. This holding was reinforced in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), where the Court rejected the argument that "disclosure requirements must be limited to speech that is the functional

equivalent of express advocacy." 558 U.S. at 369; see *McKee*, 649 F.3d at 54-55 ("We find it reasonably clear, in light of *Citizens United*, that the distinction between issue discussion and express advocacy has no place in the First Amendment review of these sorts of disclosure-oriented laws.").

¶ 28. With this background, we turn to our analysis of GMF's constitutional claims. In doing so we start with three general points. First, this case involves primarily "as-applied" constitutional claims. In its complaint, the State claimed violations of three statutory regulations: failure to register as required by 17 V.S.A. § 2831(a); failure to file a campaign finance report as required by 17 V.S.A. § 2811(c); and failure to include in "electioneering communications" an address as required by 17 V.S.A. § 2892. GMF filed an answer alleging that the laws the State seeks to apply to GMF violate the First Amendment to the U.S. Constitution. This allegation created the as-applied challenge.

¶ 29. GMF also filed a counterclaim with four counts. Two of these counts related directly to the State's action against GMF. They could equally have been alleged as affirmative defenses that restate and amplify the as-applied challenge. One, Count IV, alleges that the definition of electioneering communication in 17 V.S.A. § 2891 is overbroad and vague. Another, Count III, alleges that the definition of political committee or political action committee in 17 V.S.A. § 2801(4) is overbroad and vague. For these counts, GMF sought a declaration that the statutory scheme is unconstitutional. We interpret these counts as facial challenges to the statute.

¶ 30. As a second general point, we observe that increasingly, as this case has progressed, GMF has focused on Count III of the counterclaims, challenging the definition of political action committee or political committee, see *supra*, ¶ 4, and making the argument that the definitions are unconstitutional under *Buckley* particularly because they trigger other obligations with emphasis on the contribution limits applicable to a PAC. In GMF's reply brief, the arguments narrow almost exclusively to the definition of a political action committee and the accompanying registration and contribution requirements. GMF argues that: (1) the State's precedents are irrelevant to the extent that they involve statutory schemes that do not have contribution limits; and (2) statutory schemes with contribution limits should be construed, with respect to all elements — including disclosure requirements — to apply only in cases of express election advocacy using the *Buckley* magic words.

¶ 31. There are two ways to look at the issue of the statutory definition of a PAC. Under GMF's theory, it is the central element that triggers all the other regulatory requirements so that, if the definition of a PAC is unconstitutionally broad, there can be no regulation of any type, including disclosure regulation. The contrary theory is that GMF is attacking a definition, and not a substantive requirement, and that the definition may be adequate for some requirements but not for others. Indeed, the definition of a PAC is irrelevant to the regulation of electioneering communications, because that provision targets the communication and not the speaker. See 17 V.S.A. § 2892.

¶ 32. ■ The modern decisions in this area have uniformly adopted the second theory and have analyzed each substantive requirement independent of the others. See *Worley v. Fla. Sec'y of State*, 717 F.3d 1238, 1243-44 (11th Cir. 2013) (PAC regulations themselves are not subject to strict scrutiny; every circuit has applied exacting scrutiny to disclosure schemes); see generally *McKee*, 649 F.3d at 56 ("[Plaintiff's] attempt to ascribe a free-standing significance to the PAC label is unpersuasive. It is not the designation as a PAC but rather the obligations that attend PAC designation that matter for purposes of First Amendment review."); *Vt. Right to Life Comm. v. Sorrell*, 875 F. Supp. 2d 376, 392 (D. Vt. 2012) ("[I]t is the underlying regulation, not the PAC definition, that counts."). Thus, the fact that a definition is overbroad for a contribution limit does not make it so for purposes of a disclosure requirement. It is no mystery, of course, why a party would choose to argue otherwise: GMF argues that the Vermont disclosure provisions must meet a more stringent constitutional standard because they are in a statutory scheme that includes contribution limits. Again, the logic is that a contribution limit must survive strict scrutiny, and therefore the definition of a PAC must also survive strict scrutiny or, if it does not, GMF is not a PAC and is unregulated. At least impliedly because it was reviewing statutory schemes with contribution or expenditure limits, the U.S. Supreme Court rejects this argument. The lower court precedents explicitly reject it, especially with respect to disclosure requirements. See *Worley*, 717 F.3d at 1243-44; *Human Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1013 (9th Cir. 2010).

¶ 33. There is another consequence here that undermines GMF's approach. Although GMF has characterized contribution

limits as unreasonable burdens, it has never challenged the limits in the Vermont statute even in its counterclaims.[6] Thus, it seeks to strike down the entire regulatory regime based on the presence of contribution limits without a holding that disclosure limits are unconstitutional. See *McKee*, 649 F.3d at 55-56 (noting that plaintiff's arguments are contradictory because they seek to justify the application of strict scrutiny review based on an undefined set of PAC burdens, but they do not attack the burdens, only the PAC definition); *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 393 ("Since [appellant] has not raised issue with the contribution restriction, it strikes the Court as improbable that the challenge relates to any PAC burden other than the registration and reporting disclosure requirements.").

¶ 34. The differences in the way the parties view this case are brought to a head by the State's characterization of the case as a disclosure case and GMF's insistence that it is instead a PAC case. In our view, the State's characterization is accurate — this is a disclosure case, and GMF's attempt to broaden it beyond disclosure is ineffective.

¶ 35. As a third and final general point, we note that we are proceeding on well-charted ground. Virtually all of the litigation about disclosure requirements has been about what Senator Susan Collins of Maine called "bogus issue advertising." See *McConnell*, 540 U.S. at 170 (quoting Senator Collins as stating, "the twin loopholes of soft money and bogus issue advertising have virtually destroyed our campaign finance laws, leaving us with little more than a pile of legal rubble"). The Court in *McConnell* addressed an asserted issue advertisement that uses the same approach as the advertisement before us, albeit on a different subject. See *id.* at 194 n.78.

¶ 36. Since *Citizens United*, there have been a number of federal circuit court decisions upholding campaign finance disclo-

---

[6] GMF's failure to challenge the contribution limits may have been affected by the decision of the U.S. District Court for the District of Vermont that the contribution limits are unconstitutional if a PAC makes only independent expenditures, and that the court must make a factual inquiry to determine whether the PAC makes solely independent expenditures. *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 405-06. Thus, if the expenditures here are independent under *Vermont Right to Life*, there are no applicable contribution limits eliminating GMF's argument that the presence of contribution limits governs how we review disclosure requirements. In fact, the issue of whether GMF's expenditures are independent has never been raised in this case.

sure requirements against facial challenges. See *Madigan*, 697 F.3d at 470 n.1 (collecting cases); see also *Worley*, 717 F.3d at 1252. Most are cited and relied upon in our analysis of GMF's claims, *supra* and *infra*. In addition, the U.S. District Court for the District of Vermont has recently considered a facial challenge to the same campaign finance statutes at issue here and found them to be constitutional. *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 386-400.

¶ 37. We turn next to the various requirements GMF has challenged. We start with the as-applied challenge to the disclosure requirements, including the disclosures made in the registration and the identification information required for electioneering communications. Although we have separately characterized the registration and identification requirements to explain the specific provisions the trial court found GMF to have violated, we can properly analyze them here as disclosure requirements. See *The Real Truth About Abortion, Inc. v. Fed. Election Comm'n*, 681 F.3d 544, 551 n.3 (4th Cir. 2012) (stating that registration requirement is "akin to the disclosure requirements" for purposes of constitutional analysis); *McKee*, 649 F.3d at 55 n.29 (stating that registration is "first and foremost a disclosure provision"). Viewed as a disclosure regulation, the registration component for a PAC is very modest — to provide its full name and address, the name of its treasurer, and the name of the bank in which it maintains its campaign checking accounts. 17 V.S.A. § 2831(a). As one court noted, these requirements reflect little more than what a prudent organization would do. See *Worley*, 717 F.3d at 1250. We judge the registration requirements to add little to the analysis.

¶ 38. ██ ██ *Citizens United* sets out the primary law under which we must evaluate a First Amendment challenge to disclosure requirements. The U.S. Supreme Court recapitulated that campaign-finance-disclosure requirements have the least burden on First Amendment rights because they "impose no ceiling on campaign-related activities and do not prevent anyone from speaking." *Citizens United*, 558 U.S. at 366 (quoting *Buckley*, 424 U.S. at 64, and *McConnell*, 540 U.S. at 201) (internal quotation marks omitted). Thus, these requirements must meet a standard of exacting scrutiny, "which requires a substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Id.* at 366-67 (quotation omitted); see *Madigan*, 697 F.3d at 477. The substantial governmental interest involved is

in "providing the electorate with information about the sources of election-related spending." *Citizens United*, 558 U.S. at 367 (quotation omitted). Contribution disclosure requirements were upheld in *McConnell* as substantially related to the governmental interest. *McConnell*, 540 U.S. at 194-97. Under *McConnell* and *Citizens United*, the disclosure requirements here survive the basic First Amendment challenge.[7] See *Madigan*, 697 F.3d at 499; *McKee*, 649 F.3d at 57; *Brumsickle*, 624 F.3d at 1018; *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 397.

¶ 39. GMF attacks the disclosure requirements as overbroad and vague. On these points, it argues that the governing law comes from *Buckley*. In addressing this as-applied challenge, we point out that the trial court found that GMF made the minimum-qualifying expenditures for the purpose of opposing a candidate, and the court did not address the State's claim that the expenditures were made to influence an election. Even if *Buckley* provided the governing law, it is debatable how its analysis would apply to this "influencing" standard.

¶ 40. But, as discussed above, *Buckley* is not the governing law on the constitutional arguments raised by GMF. GMF's overbreadth argument, derived from *Buckley*, that the disclosure requirements must apply only to express election advocacy, has been clearly rejected by *Citizens United* and *McConnell*. *Citizens United* specifically rejected the "contention that the disclosure requirements must be limited to speech that is the functional equivalent of express advocacy." 558 U.S. at 369; see also *McConnell*, 540 U.S. at 193-94 (following *Citizens United*'s rejection of a strict divide between express advocacy and issue advocacy); *Madigan*, 697 F.3d at 484 (same); *Brumsickle*, 624 F.3d at 1016 (same).[8]

¶ 41. Nor do we believe that GMF's vagueness argument fares any better. There can be no serious argument that the purpose of GMF's advertisements was not to oppose Brian Dubie's campaign for Governor, despite the absence of any magic words. As the

---

[7] GMF has not directly argued that the disclosure requirements fail to satisfy exacting scrutiny, but we include this analysis to show the basic validity of the requirements.

[8] Although not necessary for us to state, but clear in light of the trial court's evaluation of GMF's communications, those communications would meet a standard of functional equivalency with express advocacy. See, e.g., *Brumsickle*, 624 F.3d at 1015-16.

Supreme Court said in *McConnell*, the magic words requirement of *Buckley* "is functionally meaningless." *McConnell*, 540 U.S. at 193. Objectively evaluated, as the trial court did here, we do not believe the standard "for the purpose of . . . opposing one or more candidates" is vague; indeed it is very close to wording found not to be vague in *McConnell*. See *McConnell*, 540 U.S. at 170 n.64; see also *Madigan*, 697 F.3d at 486; *McKee*, 649 F.3d at 63; *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 389.

¶ 42. While we do not have to evaluate the definition of "electioneering communication" to determine whether it is over-broad or vague, in view of GMF's failure to appeal the trial court decision on this point, we note that this definition is also essentially the same as that evaluated and upheld in *McConnell*. *McConnell*, 540 U.S. at 102; see *Madigan*, 697 F.3d at 491; *McKee*, 649 F.3d at 62-63. We see no ground to find it either overbroad or vague. *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 400 & n.19.

¶ 43. We affirm the trial court's decision with respect to its conclusion on the merits that GMF violated each of the sections alleged and that the law as applied is constitutional. This answers GMF's as-applied challenges.

¶ 44. GMF's facial challenge is broader primarily because it challenges the alternative element of "influencing an election," which was not the basis for the as-applied challenge.[9] In all other respects our analysis is the same as that above for the as-applied challenge. The exacting scrutiny standard applies and is met. The additional element is not overbroad in light of the holding of *Citizens United* that disclosure regulation can apply to issue advocacy. Nevertheless, the trial court held that it needed to narrow the definition of a PAC in 17 V.S.A. § 2801(4) to avoid a conclusion that the definition is vague. It did so by collapsing the alternative element ("influencing an election") into the other relevant element — "supporting or opposing one or more candidates."

¶ 45. ▇ Statutes "are unconstitutionally vague when they either (1) fail to provide sufficient notice of what conduct is prohibited, or (2) authorize or encourage arbitrary and discriminatory enforcement by failing to provide explicit standards." *In re Rusty*

---

[9] As with the as-applied challenge, the facial challenge to the definition of an "electioneering communication" is not part of the appeal.

*Nail Acquisition, Inc.*, 2009 VT 68, ¶ 12, 186 Vt. 195, 980 A.2d 758. Furthermore, "[t]he concern for vagueness is heightened in the context of the First Amendment." *Vt. Right to Life Comm.*, 875 F. Supp. 2d at 386; see also *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19, 130 S. Ct. 2705, 2719 (2010) ("We have said that when a statute interferes with the right of free speech or of association, a more stringent vagueness test should apply." (quotation omitted)).[10]

¶ 46. ■ As noted above, 17 V.S.A. § 2801(4) defines a political committee as a group that makes certain expenditures for one of three alternative reasons: "for the purpose of supporting or opposing one or more candidates, influencing an election, or advocating a position on a public question." With respect to elections of public officers, as opposed to "public question" elections, we read the statute as containing two alternative elements: "for the purpose of supporting or opposing one or more candidates" and "for the purpose of . . . influencing an election." The trial court, faced with GMF's vagueness claim, decided that the meaning of the statute must be narrowed to avoid a vague decision striking the second element and leaving the first one above: "for the purpose of supporting or opposing one or more candidates." In its brief, the State advocates our adoption of the trial court's interpretation of § 2801(4), stating that "[t]he superior court properly . . . interpreted the more general language 'to be the equivalent of "supporting or opposing one or more candidates," ' and therefore found no vagueness." The U.S. District Court ruled in *Vermont Right to Life Committee* that the narrowed construction adopted by the trial court eliminated any vagueness concern. See 875 F. Supp. 2d at 389.

---

[10] The State has challenged GMF's right to go beyond the facts of its communications, relying on the holding of *Village ·of Hoffman Estates v. Flipside, Hoffmann Estates, Inc.*, 455 U.S. 489, 495 (1982), that one who engages in some conduct that is clearly proscribed cannot complain of the vagueness of a law as applied to the conduct of others. Although GMF's pleadings are neither a model of completeness nor of precision, we understand that it is an advocacy organization that desires to engage in issue advocacy that could be viewed as coming under any of the elements of the definition of a PAC and trigger regulation, and that is the basis of its facial attacks. Thus, its facial attacks are not based on its past actions, about which it has raised as-applied challenges, but instead on its actions in the future. The State has not contested its right to raise an independent facial challenge by a counterclaim; nor has it claimed that GMF lacks standing to do so. In these circumstances, we reach the merits of GMF's facial-attack claims.

¶ 47. GMF's vagueness argument is specifically aimed at the phrase "for the purpose of . . . influencing an election." In addressing this argument, the trial court was particularly influenced by the analysis of the same question in *McKee*. In *McKee*, the court found that the use of the term "influencing" presented vagueness problems. 649 F.3d at 64-65. The court noted that the word "influence" is not as "result-oriented" as phrases like "promote," "oppose," "defeat," or "support," which "focus[ ] on advocacy for or against a particular candidacy." *Id.* It observed, "[c]onceivably falling within the meaning of 'influence' are objectives as varied as advocacy for or against a candidate's election; championing an issue for inclusion in a candidate's platform; and encouraging all candidates to embrace public funding." *Id.* at 65. On that basis, the court found the term to be vague: "[w]ithout more context . . . the intended meaning of 'influence' [is] uncertain enough that a person of average intelligence would be forced to guess at its meaning and modes of application." *Id.* (quotation omitted). We agree with this conclusion.

¶ 48. ■ State courts have wide latitude for assigning narrowing constructions to potentially unconstitutional statutes. In contrast to a federal court, which can adopt a narrowing construction of a state statute only if that statute is "readily susceptible" to the construction, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988), a state court "in reading a statute for constitutional testing, may give it a narrowing construction to save it from nullification, where such construction does not establish a new or different policy basis and is consistent with legislative intent." *State v. Downey*, 476 N.E.2d 121, 123 (Ind. 1985). Even when adopting a narrowing construction, we must engage in statutory construction to be sure we are not deviating from the intent of the Legislature. See *State v. Read*, 165 Vt. 141, 147, 680 A.2d 944, 948 (1996).

¶ 49. ■ A primary method of narrowing a statute by appropriate interpretation is to construe it to create an objective standard. We have done that in cases in which we faced overbreadth and vagueness challenges. See *State v. Albarelli*, 2011 VT 24, ¶¶ 13-14, 189 Vt. 293, 19 A.3d 130; *State v. Colby*, 2009 VT 28, ¶ 11, 185 Vt. 464, 972 A.2d 197; *State v. Allcock*, 2004 VT 52, ¶ 7, 177 Vt. 467, 857 A.2d 287 (mem.). We do not deviate from the intent of the Legislature by construing the statute before us to

create objective standards. The trial court adopted an objective standard.[11] We affirm and endorse that decision.

¶ 50. ■■■ We are concerned, however, that the trial court's narrowing construction went too far and left the statute not fully consistent with legislative intent. Rather than narrowing the phrase "influencing an election," it eliminated the phrase completely. We avoid statutory construction that makes a substantial part of the language superfluous, the result of the trial court's action here. See *State v. Beaudoin*, 2008 VT 133, ¶ 36, 185 Vt. 164, 970 A.2d 39. Thus, we reexamine the narrowing reached by the trial court to leave "influencing an election" intact as an alternative element.

¶ 51. The deficiency in the statutory language is that it is unclear what kind of "influence" the statute refers to — as the court pointed out in *McKee*, this could encompass advocacy for a vote for a particular outcome, or it could encompass other goals such as bringing a particular issue to the election debate or discouraging negative campaign advertisements. Furthermore, it leaves unclear whether simply raising an issue of public concern that might be an important one in the election, without any mention of a candidate, could be considered to be "for the purpose of . . . influencing an election."

¶ 52. ■■■ The canon of construction noscitur a sociis roughly means "it is known by its associates." *In re E.C.*, 2010 VT 50, ¶ 10, 188 Vt. 546, 1 A.3d 1007 (mem.) (quotation omitted). Under that principle, we "seek the meaning from the context and by the light of what precedes or follows." *Park's Adm'r v. Am. Home Missionary Soc'y*, 62 Vt. 19, 25, 20 A. 107, 108 (1890); Black's Law Dictionary 1087 (8th ed. 2004) (*"noscitur a sociis* . . . A canon of construction holding that the meaning of an unclear word or phrase should be determined by the words immediately surrounding it.").

¶ 53. ■■■ Applying this principle to 17 V.S.A. § 2801(4), we note that the specifically defined phrases ("supporting or opposing one or more candidates" and "advocating a position on a public question") are of a particular class: they both refer to advocacy

---

[11] GMF argues at great length against intent-based tests. Since the trial court rejected an intent-based test, and we agree with the trial court, we need not address these arguments specifically.

for a vote in a particular way in an election. We therefore interpret the more general language "for the purpose of . . . influencing an election" to refer only to this class of advocacy. In other words, "influencing" means encouraging a vote for or against a candidate or a vote "yes" or "no" on a public question. On this point, our views are consistent with the approach of the trial court.

¶ 54. We diverge, however, when considering the methods an organization might use to accomplish its objectives. The purpose of the methods used by GMF in this case was very clear, partially because GMF identified the candidate by name and included his pictures in the advertisements. If in the next case, however, an organization ran advertisements in the same way and in the same timeframe with respect to an election without mentioning the candidate's name, and without including a picture of the candidate, we would be reluctant to hold that the statute as narrowed by the trial court could cover this method — even if an objective observer would find the purpose to be the same as when the candidate name and picture was used. As in this case, the objective observer should look to multiple factors: for example, the timing of the advertisement, the images used in the advertisement, the tone of the advertisement, the audience to which the advertisement is targeted, and the prominence of the issue(s) discussed in the advertisement in the campaign. But where the objective observer concludes that the purpose of an advertisement is to influence voters to vote yes or no on a candidate, the "influencing an election" language should apply.[12] Other than in this circumstance, we agree with the trial court's narrowing construction.

¶ 55. ▮▮▮ While we have narrowed the statute to a lesser degree than the trial court, we have preserved a role for the contested language. We conclude that the very limited purpose

---

[12] Although we agree with *McKee* that "influencing," without further definition, is overly vague, one facet of the word in particular supports our saving construction of "influencing an election" here. The primary dictionary definition of "influence" is: "To alter or move in respect to character, conduct, or the like; to sway; persuade; affect . . . ." Webster's New World International Dictionary 1276 (2d ed. 1961). As detailed above, when an objective observer concludes that the purpose of an advertisement is to *persuade* a voter to vote in a certain way, that advertisement will be considered to be "influencing an election" as far as we interpret that phrase.

and effect of the "influencing an election" language addresses the vagueness challenge. For example, the federal court's analysis in *Vermont Right to Life Committee*, rejecting the vagueness challenge under the trial court narrowing of the statute, would be the same under the interpretation in this opinion. There, the federal court relied upon the *McConnell* analysis to conclude that "promote," "oppose," "attack," and "support" are not vague terms, and thus found the statute as construed by the trial court not vague. See *id.* Our construction, compared with the trial court's, additionally interprets "for the purpose of . . . influencing an election" to mean for the objective purpose of persuading someone to vote in a certain manner in an election. So construed, 17 V.S.A. § 2801(4) (and the similarly construed definition of "expenditure") is not vague.

¶ 56. ■■■ While we chose to adopt our narrowing construction so as to properly address GMF's facial vagueness argument, it is not — as noted above — necessary to do so in order to determine that GMF violated 17 V.S.A: §§ 2811 and 2831. That is because GMF's advertisements fit clearly into one of the specific statutory alternatives of the PAC definition: "supporting or opposing one or more candidates." GMF's advertisements featured Brian Dubie, the widely-known Republican candidate for governor, in the weeks preceding the general election, and attacked his character and fitness for office. Having found in the above sections that the statute is neither vague nor overbroad, either facially or as applied to GMF, we also affirm the trial court's finding that GMF violated 17 V.S.A. §§ 2811 and 2831.

¶ 57. The State cross-appeals the trial court's imposition of a $10,000 fine for GMF's failure to register as a political committee and its decision not to impose a fine for any of the other statutory violations. As previously stated, we review the trial court's imposition of a civil penalty under an abuse of discretion standard. *Irving Oil Corp.*, 2008 VT 42, ¶ 18. Abuse of discretion will be found where "the court either failed to exercise its discretion altogether or exercised it for reasons that are clearly untenable or unreasonable." *Herald Ass'n*, 174 Vt. at 359-60, 816 A.2d at 477-78.

¶ 58. ■■■ The trial court correctly took four factors into account in assigning the penalty: "(1) the good or bad faith of the defendants; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the necessity of vindicating the authority of the

[regulator]." See *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir. 1989).

¶ 59. The State argues that the trial court abused its discretion when it: (1) misapplied the factor of public harm by requiring evidence of actual harm; (2) misapplied the factor of deterrence by considering only deterrence of GMF rather than other potential offenders and by failing to assign penalties for the disclosure requirements; (3) improperly considered compliance with federal law as a mitigating factor; and (4) entirely failed to consider the violation of the identification requirement. We address each in turn.

¶ 60. ■■ ■■ First, in deciding not to impose any penalty for GMF's violation of the disclosure requirement, the trial court focused on the lack of harm to the public because GMF's receipts and disbursements were disclosed to the IRS and are viewable online. The State argues that in an area of "fundamental government interest" such as campaign finance, "public harm is presumed from the serious nature of the violation." The cases that the State cites, however, stand for the proposition that a court *may* presume harm, not that it must or that the violation itself constitutes harm to the public. In *Furgatch*, for example, the court's justification for allowing a trial court to presume harm was the "difficulty of proving that violations of [reporting and disclosure requirements] actually deprived the public of information." *Furgatch*, 869 F.2d at 1259. Here, the trial court's decision not to impose a penalty was not because of the difficulty of proving the harm, but because it found that there was "little or no actual harm caused."

¶ 61. Second, the State argues that the trial court misapplied the factor of deterrence when it considered counsel for GMF's representation that "GMF would abide by any order of this court which is upheld on appeal." The State argues that the factor of deterrence refers not only to a penalty imposed on the actor but also to penalties that would be imposed on other actors if they engage in similar violations. We need not consider whether it is, in fact, a requirement for a trial court to consider deterrence of other actors, because the trial court did so: "To the extent other campaigns look to this case for guidance, a $10,000 penalty is a sufficient deterrent to achieve compliance." This may not be a detailed analysis of the deterrence factor, but the court's rationale is clear.

¶ 62. The State argues further that the trial court abused its discretion when it gave a penalty only for the violation of the registration requirement because that "diminished the value of the reporting requirements" and the low total penalty will not have enough deterrent value to "secure future compliance by any political entity." This is the type of analysis that is absolutely within the realm of the trial court. While the State may disagree with the court's finding, the court applied the appropriate factors and determined that the $10,000 penalty for the violation of the registration requirement was "sufficient to meet the needs of the state to respond to GMF's failure to comply with the law." This was not an abuse of discretion.

¶ 63. Third, the State argues that the trial court abused its discretion in taking into account GMF's compliance with federal law as a mitigating factor. The trial court mentioned compliance with IRS requirements twice, and neither time did it treat such compliance as a "mitigating factor." The first time was its discussion of harm to the public. It was reasonable, and certainly not an abuse of discretion, to take into account the fact that IRS reports are posted online in evaluating whether the public was harmed by failure to disclose the same information that was in those reports. The second time was in the discussion of deterrence, where the trial court found that since GMF was already subject to, and complying with, federal law in filing disclosure reports, this was not a case in which compliance was likely to be a problem. This is a fair consideration, and does not use compliance with federal law as a "mitigating factor," but rather as a circumstance leading to a higher likelihood of compliance.

¶ 64. Finally, the State argues that the trial court failed entirely to consider the violations of the identification requirement in calculating the penalty. In its decision on summary judgment, the court rejected GMF's argument that listing its web address complied with the statutory requirement that "electioneering communications" contain the "name and address" of the political committee that paid for the communication and held that the statute requires disclosure of a "physical or mailing address." See 17 V.S.A. § 2892. Therefore, the advertisements, without the required address, were in violation of a provision of the campaign finance chapter, and GMF was subject to a civil penalty of up to $10,000 for each violation. See *id.* § 2806(b).

¶ 65. ▮▮▮▮ In the introduction to the "Decision on Civil Penalty," the court referred to its previous ruling that GMF violated Vermont campaign finance law when it "failed to register and disclose its expenditure of $429,186 on two political ads shortly before the 2010 gubernatorial election," with no mention of the violations of the identification requirement. It did, however, reference the identification requirement violation when it stated: "The potential number of individual violations is astronomical since the television advertisements were aired thousands of times." This brief (and unclear) reference to the violation of the identification requirement does not show a true exercise of discretion. See *Vt. Nat'l Bank v. Clark*, 156 Vt. 143, 145, 588 A.2d 621, 622 (1991) (a trial court's "with[holding] its discretion entirely" is an abuse of discretion). Nor does the difficulty of calculating a penalty mean that no penalty can be awarded. "It would eviscerate the [regulatory system] to allow violators to escape civil penalties on the ground that such penalties cannot be calculated with precision." *United States v. Mun. Auth. of Union Twp.*, 929 F. Supp. 800, 806-07 (M.D. Pa. 1996). While there may be other factors that would allow a court in its discretion not to assign a penalty for these violations, the court needs to state explicitly that it is doing so and include its rationale for this decision. We cannot find these actions in the trial court's decision with respect to the violation of the identification requirement.

¶ 66. ▮▮▮ Before oral argument, the State moved to strike portions of GMF's printed case because they were not part of the trial court record. V.R.A.P. 30(a)(1) provides that an appellant must prepare a printed case "containing extracts from the record that are necessary to present fully the questions raised." Because the documents to which the State objects were not filed in the trial court, they were not appropriate to include in the printed case, so this motion is granted. We have not, however, relied on either of the documents.

*Affirmed, but remanded to the trial court for consideration of a penalty for the violations of the identification requirement.*